**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

LARY LEE SPEAKMAN,

      Defendant-Appellant.

No. 08-1332

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 07-CR-00427-LTB)**

Richard J. Banta, Denver, Colorado, for Defendant-Appellant Lary Lee Speakman.

Paul Farley, Assistant United States Attorney (David M. Gaouette, Acting United States Attorney and Andrew A. Vogt, Assistant United States Attorney, on the brief) Denver, Colorado, for Plaintiff-Appellee United States of America.

Before **TYMKOVICH, ALARCON,**[*] and **EBEL,** Circuit Judges.

**EBEL**, Circuit Judge.

---

[*]     Honorable Arthur L. Alarcon, Circuit Court Judge, U. S. Court of Appeals for the Ninth Circuit, sitting by designation.

On June 13, 2008, Lary Lee Speakman pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343. Mr. Speakman was sentenced to forty-seven months in prison and ordered to pay $1,419,205.77 in restitution. On appeal, Mr. Speakman challenges only the restitution orders entered by the district court, which we have jurisdiction to review under 28 U.S.C. §1291. For the following reasons, we REVERSE.

## I.    BACKGROUND

The following facts were stipulated to in the plea agreement. Mr. Speakman became a financial consultant with Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrill Lynch") in its Denver office in about 1996. In September 1996, Mr. Speakman and his wife, Carolyn Speakman, opened a joint account at Merrill Lynch that Mr. Speakman managed as a Merrill Lynch financial consultant. In October 1998, Mrs. Speakman opened an account at Merrill Lynch in her name only, but managed by her husband. She deposited approximately $346,417 worth of stock into the account. In 2000, Mrs. Speakman made two additional deposits of stock she inherited into the same account, totaling over $2.1 million. Mrs. Speakman signed a limited power of attorney in relation to the account, granting her husband the authority to buy and sell securities in the account, but denying him use of those funds or the ability to transfer funds out of the account.

Despite lacking the authority to do so, Mr. Speakman transferred money and securities from Mrs. Speakman's account without her authorization numerous times from

1999 through 2005. On several occasions between 1999 and 2003, Mr. Speakman transferred securities from Mrs. Speakman's account to the joint account and then sold those securities for $225,370.29. On thirty-three additional occasions between 1999 and 2002, he transferred $1,126,300 from Mrs. Speakman's account to the joint account by forging her signature on Merrill Lynch forms. On an additional forty-three occasions from 1999 to 2004, Mr. Speakman wrote, or caused Merrill Lynch to write, checks totaling $257,015 on Mrs. Speakman's account payable to himself. Mr. Speakman forged his wife's signature either on the checks themselves or on the Merrill Lynch forms authorizing the checks.

Mr. Speakman transferred most of the money that went through the joint account to other accounts. In particular, Mr. Speakman wire transferred $1,308,135, in a series of fifty-three transfers, to an account for CDM Enterprises, Inc., an account he held at Evergreen National Bank in Evergreen, Colorado. Mr. Speakman controlled and possessed signatory authority over the account, which appears to have been funded largely, if not entirely, by these illegal transfers. Mr. Speakman used much of this money in the CDM account for the benefit of Roxanne Rouser. Ms. Rouser was a former martial arts student of Mr. Speakman's who had since opened her own self-defense instruction business. Mr. Speakman and Ms. Rouser also had a romantic relationship during this time, although Mr. Speakman claims it was brief and over by the mid-1990s. Mr. Speakman wrote forty-five checks from the CDM account directly to Ms. Rouser, totaling $439,050. He also wrote checks from the CDM account, totaling $115,940, to

the United States Treasury and Colorado Department of Revenue to satisfy Ms. Rouser's tax obligations, as well as those of her self-defense business.

Mr. Speakman also bought Ms. Rouser a number of gifts with his wife's money. For instance, he wrote a CDM check for $6,554.10 to buy her a motorcycle on June 23, 2000. On March 11, 2002, he wrote another CDM check for $7,423.32 to pay for a vacation for Ms. Rouser and one of her friends. Mr. Speakman also bought Ms. Rouser larger gifts with his wife's money, including a house and a diamond ring. For the house, Mr. Speakman caused Merrill Lynch to transfer $485,000 out of Mrs. Speakman's account to the joint account by forging her signature on an authorization form in October 2002. Mr. Speakman then had Merrill Lynch transfer the money to the CDM account, which he accomplished by again forging Mrs. Speakman's name. Mr. Speakman wire-transferred most of the money from the CDM account to an account for Satori Group, L.P., a company founded by him and Ms. Rouser. Ms. Rouser used this money to purchase the house, and received an additional $54,000 from the CDM account to cover various insurance and tax payments for the house. Mr. Speakman claims that he and Ms. Rouser intended to "flip" the house for a profit, but that appears to have never happened, and the house became Ms. Rouser's residence. Later, in August 2003, Ms. Rouser made a $20,000 deposit on a diamond ring, and Mr. Speakman paid the remaining $63,000 owed on the ring by writing a check drawn on Mrs. Speakman's account. Mr. Speakman forged his wife's signature on the check and wrote her driver's license number on it.

Mr. Speakman also used money from the CDM account for reasons unrelated to

-4-

Ms. Rouser. For instance, he used $260,275.92 from that account to reimburse some of his Merrill Lynch clients.[1] He also used approximately $202,300 from the account to make personal investments in several companies. In 2003, Mr. Speakman wrote two $5,000 checks from the CDM account as donations to the Golden Sun Foundation.

Mrs. Speakman eventually learned of her husband's fraud and recorded a telephone conversation with him on August 17, 2005. In that conversation, she accused him of forging her signature on the Merrill Lynch authorization forms, to which he replied, "I can't imagine I did all of that. Maybe I did." Mr. Speakman eventually admitted to forging her signature on the form transferring $485,000 from her account, as well as forging her signature on the check used to buy Ms. Rouser a diamond ring.

On October 23, 2007, a federal grand jury indicted Mr. Speakman on nine counts of wire fraud in violation of 18 U.S.C. § 1343, two counts of engaging in monetary transactions involving criminally derived property in violation of 18 U.S.C. § 1957(a), and one count of uttering and possessing a forged security in violation of 18 U.S.C. § 513(a). Mr. Speakman reached a plea agreement with the government, and, on June 13, 2008, pleaded guilty to one count of wire fraud. On September 8, 2008, the United States District Court for the District of Colorado entered judgment against Mr. Speakman and sentenced him to forty-seven months in prison, three years of supervised release, and a special assessment of $100.

---

[1] The plea agreement does not state why Mr. Speakman's clients needed to be reimbursed.

In addition, the court ordered Mr. Speakman to pay $1,225,000 in restitution to Merrill Lynch, and $194,205.77 to the Crime Victims Fund (the "Fund"). According to the Presentence Investigation Report ("PSR"), the restitution owed to Merrill Lynch was the result of a National Association of Securities Dealers (NASD) arbitration proceeding initiated by Mrs. Speakman against both Merrill Lynch and Mr. Speakman. In that proceeding, Mr. Speakman was held liable for $1,242,100. As a result of the arbitration, Merrill Lynch paid Mrs. Speakman $1,225,000. As detailed below, the award does not explicitly state the basis of Merrill Lynch's liability. The district court apparently did not have a copy of the arbitration award at the time of sentencing, and was made aware of Merrill Lynch's liability only through the PSR. On this basis, the district court concluded that Merrill Lynch was a victim of Mr. Speakman's fraud, and, therefore, Mr. Speakman was obligated to pay Merrill Lynch $1,225,000 in restitution.

The $194,205.77 sum that Mr. Speakman was ordered to pay to the Fund is the amount of restitution the court calculated that Mrs. Speakman was owed, after subtracting the amount Merrill Lynch had paid her and subtracting a portion of the amount she had recovered from Mr. Speakman in a civil suit in state court.[2] 18 U.S.C. § 3664(j)(2)(B)

---

[2] The district court did not subtract the entire amount she recovered from Mr. Speakman pursuant to the state court judgment. The state court judgment was larger than the amount of restitution the district court determined was appropriate, so the court subtracted a percentage of the amount Mrs. Speakman recovered in state court that was equal to the percentage difference between the district court's restitution order and the civil judgment entered in state court. Mr. Speakman does not challenge this methodology on appeal, and we express no view as to its propriety.

-6-

("Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in . . . any State civil proceeding . . . ."). In a letter to the probation officer who prepared the Presentence Investigation Report, Mrs. Speakman expressly declined further restitution from Mr. Speakman:

> I would not want to receive any restitution obtained at the expense of any other victim. Furthermore, I believe that a judgment in my favor against Mr. Speakman could set up a situation where he might pursue me with empty promises that he was going to make payments. I do not want to again be subjected to Mr. Speakman's emotional abuse.

The district court nevertheless felt compelled under the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A, to order Mr. Speakman to pay restitution for this loss. Because Mrs. Speakman disavowed her interest in the restitution, the court ordered Mr. Speakman to pay the amount that would be owed to Mrs. Speakman to the Crime Victims Fund. Mr. Speakman challenges both of these restitution awards, arguing that Merrill Lynch was not a victim of his fraud, and that the court lacked authority to award restitution to the Crime Victims Fund.

## II. DISCUSSION

### A. Restitution Order to Merrill Lynch

Mr. Speakman first objects to the district court's order that he pay Merrill Lynch $1,225,000 in restitution arising from the arbitration panel's award. We review the factual findings of the district court for clear error and its application of the MVRA de novo. United States v. Gallant, 537 F.3d 1202, 1247 (10th Cir. 2008).

-7-

## 1.    Definition of "Victim"

The MVRA provides that, for certain crimes, "the court shall order . . . that the defendant make restitution to the victim of the offense."  18 U.S.C. § 3663A(a)(1).  Mr. Speakman concedes that the MVRA applies to the count of wire fraud to which he pleaded guilty, see id. § 3663A(c)(1)(A)(ii) (applying MVRA to "an offense against property . . . committed by fraud or deceit"), but contends that Merrill Lynch is not a "victim" within the meaning of the Act.  For purposes of the MVRA, a "victim" is

> a person <u>directly and proximately harmed</u> as a result of the commission of an offense for which restitution may be ordered <u>including</u>, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person <u>directly harmed</u> by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

Id. § 3663A(a)(2) (emphasis added).  This definition of "victim" thus sets forth two separate ways an individual can be a victim under the MVRA: first, if the person is "directly and proximately harmed as a result of the commission of an offense" covered by the MVRA; second, if the defendant's crime includes an element that the defendant engaged in "a scheme, conspiracy or pattern of criminal activity," then the person will be a victim if he is "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern of criminal activity." Id.; see also Gallant, 537 F.3d at 1248 ("A 'victim' under the MVRA is someone who is 'directly harmed by the defendant's criminal conduct in the course of the scheme.'" (quoting 18 U.S.C. § 3663A(a)(2)).  The first of these definitions is in some ways broader because it requires only that the individual be harmed "as a result of" the defendant's offense, and not "in the

-8-

course of" the offense. The first clause also "includ[es]" the second, which applies only to those crimes that involve, as an element, a scheme, conspiracy, or pattern of criminal activity, and even then applies only when the individual is harmed "in the course of the scheme, conspiracy, or pattern." It thus follows that an individual could be deemed a victim by meeting the first criteria only, and not the second.

Following our decision in United States v. Gallant, the district court in this case concluded that Merrill Lynch was a victim under the second criterion. In Gallant, we held that wire fraud, Mr. Speakman's crime of conviction, includes as an element a "scheme" to defraud. Gallant, 537 F.3d at 1248 ("A guilty verdict for wire fraud . . . necessarily establishes the existence of a scheme to defraud [under the MVRA].") Accordingly, we concluded that when the defendant commits wire fraud, an individual will be deemed a victim so long as he was directly harmed in the course of the scheme. Id. at 1248; see also United States v. Gordon, 480 F.3d 1205, 1211 (10th Cir. 2007) (recognizing that MVRA applies not only to those harmed by the offense of conviction, but also to those directly harmed by the defendant's criminal conduct in the course of a "scheme, conspiracy, or pattern of criminal activity").

On this basis, the district court concluded that Merrill Lynch was "directly harmed by the defendant's criminal conduct in the course of the scheme," and was therefore a victim under the MVRA entitled to restitution. (R. Vol. 2 at 14-15.) The district court applied the wrong standard, however. The standard employed by the district court applies only when the alleged victim is "directly harmed by the defendant's criminal

-9-

conduct <u>in the course of the scheme</u>." 18 U.S.C. § 3663A(a)(2) (emphasis added). In

<u>Gallant</u>, for example, the defendants committed acts of wire fraud in order to sell a credit

card portfolio by misrepresenting its delinquency risk. <u>Gallant</u>, 537 F.3d at 1249. The

individual that they hired to market their portfolio was directly harmed in the course of

their scheme because his participation was essential to their scheme, and if the defendants

had not committed wire fraud, the victim "likely would not have incurred the expenses to

market the account." <u>Id.</u>

Here, by contrast, the harm that the government claims Merrill Lynch endured

occurred when Merrill Lynch was found liable to Mrs. Speakman, well after the

conclusion of Mr. Speakman's scheme. Unlike the scheme in <u>Gallant</u>, which required the

victim's participation to be successful, Mr. Speakman's scheme did not contemplate that

Mrs. Speakman would file an NASD arbitration. In fact, if Mrs. Speakman had never

brought the NASD arbitration—which took place after Mr. Speakman's fraudulent

scheme had run its course—Merrill Lynch would not have been harmed by Mr.

Speakman's conduct at all. Therefore, Merrill Lynch's harm cannot be said to have

arisen "in the course of the scheme."

### 2. Requirement of Direct and Proximate Harm

As noted above, Merrill Lynch may still be a victim of Mr. Speakman's fraud if it

meets the first criterion of § 3663A(a)(2): that is, Merrill Lynch may be a victim under

the MVRA if it was "directly and proximately harmed <u>as a result of</u>" Mr. Speakman's

fraud. <u>Id.</u> (emphasis added). Although this was not the basis of the district court's

-10-

determination that Merrill Lynch was a victim, the parties have briefed the issue to this court and we can consider whether to affirm the district court's determination on this alternate ground. See United States v. Sandia, 188 F.3d 1215, 1217 (10th Cir. 1999) ("[W]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (quotation omitted)).

We first note that phrase "directly and proximately" uses the conjunctive "and," which indicates that direct harm and proximate harm have separate meanings. Cf. Qwest Commc'ns Int'l, Inc. v. F.C.C., 398 F.3d 1222, 1236 (10th Cir. 2005) (noting that use of the word "and" in setting out F.C.C.'s duties "clearly indicates that the Commission cannot satisfy the statutory mandate by simply doing one or the other"). Other circuits that have considered the phrase "directly and proximately harmed" in the MVRA and other federal restitution statutes have required more than "but for" causation. The Second Circuit, for example, has held that the "requirement that the victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analyses." In re Rendon Galvis, 564 F.3d 170, 175 (2d Cir. 2009).[3] This interpretation

---

[3]     Galvis construed the definition of victim in the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, not the MVRA. The definition of "victim" in the two statutes, however, is virtually identical. Compare 18 U.S.C. § 3771(e) (defining "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense") with 18 U.S.C. § 3663A(a)(2) (defining "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered") (emphases added).

makes a good deal of sense, as it essentially requires a showing of "but-for" causation to show that a victim was directly harmed, and a showing of proximate causation to show that a victim was proximately harmed. See also In re Antrobus, 519 F.3d 1123, 1126 (10th Cir. 2008) (Tymkovich, J., concurring) ("[a]pplying traditional rules of 'but-for' and 'proximate' causation" in the CVRA context, and noting that "direct []" harm "encompasses a 'but-for' causation notion" that is different from proximate harm). Similarly, the First Circuit has held that a two-pronged approach is appropriate when defining the causation standard required to show that someone is a victim under the MVRA. "[T]he government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002); see also United States v. Robertson, 493 F.3d 1322, 1334 (11th Cir. 2007) (quoting Cutter, 313 F.3d at 7).

We agree with these courts that to show that one is a victim under the MVRA, the government must show both that the defendant's conduct is the "but-for" cause of the individual's harm and that the defendant "proximately" caused the harm. In Mr. Speakman's case, the parties do not dispute that Mr. Speakman was a but-for cause of Merrill Lynch's loss, as Merrill Lynch never would have had to pay Mrs. Speakman any money under the arbitration award if not for Mr. Speakman's fraud. The district court stopped here in its analysis, concluding that Merrill Lynch was "directly harmed by the

-12-

defendant's criminal conduct in the course of the scheme" and was therefore a victim within the meaning of the MVRA. (R. Vol. 2 at 14-15.) As noted above, however, because Merrill Lynch was not harmed in the course of Mr. Speakman's fraud, the district court also needed to consider whether Merrill Lynch was proximately harmed by Mr. Speakman's fraud. The court could thus only order restitution if Mr. Speakman's fraud against his wife proximately caused the loss to Merrill Lynch.

### 3. Proximate cause standard

While we have not articulated a precise standard of proximate cause in the MVRA context, we have recognized that the "main inquiry for causation in restitution cases [is] whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct." United States v. Wilfong, 551 F.3d 1182, 1187 (10th Cir. 2008) (quoting United States v. De La Fuente, 353 F.3d 766, 772 (9th Cir. 2003)); see also United States v. Gamma Tech Indus., Inc., 265 F.3d 917, 928 (9th Cir. 2001) ("Defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct."). Other courts have also focused on the need for the harm suffered by the alleged victim to be "not too attenuated" from the defendant's wrongful act. See Robertson, 493 F.3d at 1334 ("[T]he government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." (quoting Cutter, 313 F.3d at 7)). We thus

-13-

hold that, for the purposes of determining if an individual is a "victim" under the MVRA, an individual will be "proximately harmed as a result of" the defendant's crime if either there are no intervening causes, or, if there are any such causes, if those causes are directly related to the defendant's offense.

There are potentially two intervening causes between Mr. Speakman's wire fraud and the loss Merrill Lynch suffered. First, Mrs. Speakman's initiation of arbitration against Merrill Lynch is an intervening cause of Merrill Lynch's harm, because Merrill Lynch presumably would not have had to pay $1,225,000 if Mrs. Speakman had not brought the arbitration. We have little difficulty in concluding that the arbitration was "directly related to the offense conduct," because Mrs. Speakman initiated the arbitration directly in response to Mr. Speakman's fraud in an attempt to recover the money he stole from her. This is a direct relationship that is not too attenuated from Mr. Speakman's fraud so that it would be unjust to hold him responsible.

The second intervening cause between Mr. Speakman's fraud and Merrill Lynch's harm is whatever caused the arbitrator to rule that Merrill Lynch was liable to Mrs. Speakman in the NASD arbitration. However, the record does not reflect the basis for Merrill Lynch's liability in the arbitration, so we cannot be sure if Merrill Lynch's liability was based on respondeat superior principles, negligence in supervising Mr.

Speakman, or some other basis entirely.[4]  And because, as explained below, whether

Merrill Lynch was proximately harmed by Mr. Speakman's fraud depends on the basis of

Merrill Lynch's liability to Mrs. Speakman in the NASD arbitration, the government has

not met its burden of establishing that Merrill Lynch was a victim of Mr. Speakman's

fraud.[5]  Because the district court did not require a showing of proximate cause in its

determination of whether Merrill Lynch was a victim, the government never attempted to

establish that element.  Mindful of the MVRA's interest in providing compensation to

victims of crime, we conclude that a remand is appropriate to allow the government to

present evidence of the proximate cause of Merrill Lynch's loss to the district court in the

first instance.

---

[4]      The government has attached a copy of the arbitration award to its brief and
requested that we take judicial notice of it.  While we are entitled to take judicial notice
of public records, see State Farm Mut. Auto. Ins. Co. v. Boellstorff, 540 F.3d 1223, 1226
n.7 (10th Cir. 2008), the NASD (which no longer exists) was not a public agency, so its
arbitration awards are not public records. We are thus unconvinced that we can take
judicial notice of the contents of a private arbitration award, and we decline to do so.
Further, even if we could take judicial notice of it, the document only confirms the
ambiguity of the basis of Merrill Lynch's liability.

[5]      Although the statute does not state who bears the burden of proving that an
individual is a victim under the MVRA, it makes more sense to require the government to
establish that an individual is a victim rather than requiring the defendant to prove that an
individual is not a victim.  See 18 U.S.C. § 3664(e) ("The burden of demonstrating
such . . .  matters as the court deems appropriate shall be upon the party designated by the
court as justice requires."); see also United States v. Waknine, 543 F.3d 546, 556 (9th
Cir. 2008) ("The government bears the burden of proving that a person or entity is a
victim for purposes of restitution . . . .").

-15-

In order to provide the district court with guidance as to what constitutes proximate cause in this instance, we next consider whether proximate cause would be established if the government is able to establish that Merrill Lynch's liability in the arbitration arose from either <u>respondeat superior</u> or negligence.

### a. **<u>Respondeat Superior</u>**

If Merrill Lynch's liability was premised on a <u>respondeat superior</u> theory, then there really is no second intervening cause, as employers are generally held liable on that theory not because of any act or omission on their part, but rather because the employee was acting within the scope of his duty. <u>See generally</u> Restatement (Third) Agency § 7.07 (2006). If the government could establish that Merrill Lynch was liable to Mrs. Speakman under a <u>respondeat superior</u> theory, we would thus have little trouble concluding that Merrill Lynch was directly and proximately harmed by Mr. Speakman's fraud.

### b. **Negligent Supervision**

Although a closer question, we also think that Merrill Lynch's harm would still be directly related to Mr. Speakman's fraud even if Merril Lynch was held liable in the arbitration because of its own negligence in supervising Mr. Speakman. Mr. Speakman must have anticipated that Merrill Lynch would not diligently supervise his actions, or else he would not have been able to commit the fraud in the first place. In addition, the negligent supervision only gave rise to Merrill Lynch's liability because of the fraud that Mr. Speakman was committing. Thus, unlike a volitional act, negligent supervision

-16-

would not be a cause by itself. It thus cannot be an intervening cause. This satisfies us that Merrill Lynch's harm would be directly related to Mr. Speakman's fraud if Merrill Lynch's liability arose from its own negligence in supervising Mr. Speakman.

### c. Other Bases for Merrill Lynch's Liability

Unfortunately, based on the record before us, we cannot even determine whether either respondeat superior or negligent supervision provided the basis for Merrill Lynch's liability to Mrs. Speakman. It is possible that the NASD arbitration found Merrill Lynch liable for other reasons, possibly for an intentional harm that Merrill Lynch itself committed. The only reference to Merrill Lynch's liability contained in the record is a statement by the probation officer in the PSR, based on a statement from Merrill Lynch itself, that "Merrill Lynch and the defendant were found jointly and severally liable for losses to Mrs. Speakman in the amount of $1,225,000." (PSR at A-3.) With no further information concerning Merrill Lynch's liability in the arbitration, it remains possible that Merrill Lynch was liable to Mrs. Speakman because of its own volitional acts. In such a case, Merrill Lynch would not have been proximately harmed by Mr. Speakman because it was its own actions that gave rise to its liability, and thus Merrill Lynch's harm would not be directly related to Mr. Speakman's fraud. Just as a third party's intentional tort will generally be held as a superseding cause of a harm, thereby relieving another party of liability for negligence, we are satisfied that any intentional act that Merrill Lynch may have taken would be a superseding cause of its liability that would break the

-17-

causal chain between Mr. Speakman's actions and Merrill Lynch's loss sustained in the arbitration.  See Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 620 (10th Cir. 1998) ("When the intervening act is intentionally tortious or criminal, it is more likely to be considered independent." (quotation omitted)); see also Restatement (Second) of Torts § 448 ("The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom . . . .").  Indeed, it would be odd to consider Merrill Lynch a victim of Mr. Speakman's fraud if the reason it suffered harm was because of its own intentional conduct.[6]

We therefore vacate this portion of defendant's sentence and remand for the district court to perform further fact-finding as to whether Mr. Speakman proximately caused Merrill Lynch's harm.

## B.  Restitution Order to Crime Victims Fund

Mr. Speakman also argues that the district court erred in ordering him to pay $194,205.77 in restitution to the Crime Victims Fund.  That sum was owed to Mrs. Speakman as a result of the fraud, but Mrs. Speakman specifically disclaimed her interest in receiving the money.  The district court believed that it was nevertheless required to

---

[6]    For the same reasons, we cannot affirm the restitution order under 18 U.S.C. § 3664(j)(1), as the government requests.  That provision of the statute states: "If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided . . . compensation." 18 U.S.C. § 3664(j)(1).  Without knowing the basis of Merrill Lynch's liability, we cannot conclude that Mrs. Speakman's recovery against Merrill Lynch was compensating for loss caused by Mr. Speakman rather than loss caused by Merrill Lynch's own conduct.

order restitution, because the MVRA imposes a mandatory requirement on district courts to order restitution. Specifically, the statute says that

> Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.

18 U.S.C. § 3663A(a)(1) (emphasis added). The MVRA must be construed in conjunction with 18 U.S.C. § 3664, however, which outlines the procedures for enforcing a restitution order. See id § 3663A(d) (stating that a restitution order under the MVRA "shall be issued and enforced in accordance with section 3664"). Section 3664 states: "No victim shall be required to participate in any phase of a restitution order." Id. § 3664(g)(1). The statute also provides that "[a] victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments." Id. § 3664(g)(2).

The district court interpreted these three statutory provisions—§§ 3663A(a)(1), 3664(g)(1), and 3664(g)(2)—as imposing a mandatory obligation on the court to order restitution. Even though Mrs. Speakman did not assign her interest in restitution to the Fund, the court was concerned that by not ordering any restitution, it would allow the victim to "trump[] the [mandatory nature of the] statute, when we have a receptacle in the victim's restitution fund for the disposition of restitution amounts." (Tr. at 10, R. Vol. 2.) The district court concluded that it had a "statutory duty to order" restitution, and that the

-19-

victim's decision to forego restitution cannot abrogate that duty.  (Id. at 11.)

Accordingly, because the court believed it was bound to order restitution under the

MVRA and because § 3664(g)(2) establishes a receptacle to which victims can assign

their restitution interests, the court ordered the restitution due to Mrs. Speakman be paid

instead into the Crime Victims Fund.

We disagree with the district court.  As the starting point of our analysis, we note

that "'[f]ederal courts possess no inherent authority to order restitution, and may only do

so as explicitly empowered by statute.'"  United States v. Nichols, 169 F.3d 1255, 1278

(10th Cir. 1999) (quoting United States v. Hensley, 91 F.3d 274, 276 (1st Cir. 1996)).

While we agree that the MVRA imposes a mandatory obligation on courts to order

restitution in certain cases, restitution is only mandatory if it is ordered either to "the

victim of the offense or, if the victim is deceased, to the victim's estate."  18 U.S.C. §

3663A(a)(1).  Here, the victim (Mrs. Speakman) is alive, so the MVRA, read in isolation,

would appear to require the district court to order restitution to Mrs. Speakman.  The

MVRA must be read in conjunction with § 3664(g)(1), however, which permits a victim

to decline restitution.  See id. § 3663A(d) (directing courts to issue restitution orders "in

accordance with section 3664").  These two statutes can thus be read together in a

sensible way.  Because restitution is only mandatory when ordered to the victim or the

victim's estate, see id. § 3663A(a)(1), and because victims are not "required to participate

in any phase of a restitution order," see id. § 3664(g)(1), courts are not required to order

restitution if the victim declines the restitution without assigning her interest to the Fund.

-20-

The district court's emphasis on § 3664(g)(2) is also misplaced. By its own terms, that provision only permits restitution to be made to the Fund if the <u>victim</u> "assign[s] the victim's interest in restitution payments to the Crime Victims Fund." <u>Id.</u> § 3664(g)(2). The statute could have been written so as to authorize the court to order restitution payments to the Fund even when the victim failed to assign her interest, or to require the victim to either accept restitution or assign her interest to the fund. However, as written, the statute only authorizes restitution to (1) the victim (§ 3663A(a)(1)), (2) the victim's estate, if the victim is deceased (§ 3663A(a)(1)), (3) "persons other than the victim" if "agreed to by the parties in a plea agreement" (§ 3663A(a)(3)), or (4) the Crime Victims Fund, <u>if the victim</u> assigns her interest to the Fund (§ 3664(g)(2)).[7] Here, the predicates for (2), (3), and (4) are not met, and the victim has renounced her interest in restitution. There is thus no statutory basis to support the district court's award of restitution to the Fund.

The legislative history of §§ 3663A and 3664 reinforce this conclusion in two ways. First, although § 3664 was originally enacted prior to § 3663A, the provisions of § 3664 at issue here—namely, § 3664(g)(1) and (2)—were enacted as an amendment to §

---

[7]    Some courts have held that § 3663A(b)(2)(A) also permits courts to order a defendant to pay restitution to another non-victim, a hospital that provided medical or psychiatric care to a victim. <u>See</u> <u>United States v. Johnson</u>, 400 F.3d 187, 200 (4th Cir. 2005) (upholding order requiring defendant to pay restitution to victim's counselor); <u>United States v. Cliatt</u>, 338 F.3d 1089, 1091 (9th Cir. 2003) (upholding order requiring defendant to pay restitution to a hospital that provided treatment to victim). We express no opinion as to that provision.

3664 in the same bill in which Congress enacted § 3663A. <u>See</u> Antiterrorism & Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 204, 206, 110 Stat. 1214, 1227-36 (1996). This underscores the importance of reading § 3663A in conjunction with § 3664, and strongly suggests that while Congress intended to order mandatory restitution to victims (§ 3663A(a)(1)), it also expressly gave victims the right to decline that restitution (§ 3664(g)(1)). Second, the Senate considered and rejected a broader version of § 3664(g)(1): "(g)(1) No victim shall be required to participate in any phase of a restitution order. If a victim declines to receive restitution made mandatory by this title, <u>the court shall order that the victim's share of any restitution owed be deposited in the Crime Victims Fund in the Treasury</u>." S. Rep. No. 104-179, at 6 (1995) (emphasis added). Section 3664(g)(2) in this proposed bill, just as in the version finally adopted, also gave victims the option of assigning their interest to the Fund. <u>Id.</u> Thus, the proposed legislation would have explicitly authorized the restitution order entered by the district court here; however, the enacted statute lacks any such explicit authorization. While evidence of what Congress considered but did not enact may not be conclusive proof of the proper construction of the statute, this legislative history further underscores what we believe is the proper reading: that Congress only authorized courts to order a restitution payment to the Fund when the victim herself assigns her interest to the Fund.

Our conclusion also finds support in the Seventh Circuit's holding in <u>United States v. Pawlinski</u>, 374 F.3d 536 (7th Cir. 2004). In <u>Pawlinski</u>, an alderman committed mail fraud by using money contributed to his campaign fund for purposes unrelated to the

campaign. Id. at 537. The court ordered the defendant to pay restitution and to deposit the sum owed in the district court. Id. The court then notified the contributors that they could be reimbursed for their donation, but many contributors did not collect what they were owed. Id. The defendant suggested that this unclaimed amount be returned to the campaign fund, which could then be dissolved in accordance with state law. Id. at 538. The government was indifferent between that outcome and paying the unclaimed sum to the Crime Victims Fund, and the district court ordered the money to be paid into the Fund. Id. The Seventh Circuit reversed, holding that "[a]n order of restitution under [the MVRA] . . . must go to victims of the defendant's crimes, and the Crime Victims Fund is neither a victim of Pawlinski nor a representative of his victims." Id. at 539. The court recognized that there were only two exceptions contained in the MVRA that permit restitution to nonvictims: "if the order is imposed pursuant to a plea agreement which provides for restitution to nonvictims, or if the victims assign their right to restitution to the Crime Victims Fund." Id. at 539-40 (citing 18 U.S.C. §§ 3663A(a)(3), 3664(g)(2)). The court in Pawlinski reversed the restitution order because "[f]ederal courts cannot order restitution in a criminal case without a statutory basis," and no such basis existed. Id. at 540. We, too, lack a statutory basis here, and so the district court could not order Mr. Speakman to pay restitution to the Fund.

In contrast to our holding today and the Seventh Circuit's decision in Pawlinski, the Second Circuit has affirmed a court's sua sponte award of restitution to the Fund. Focusing on the mandatory language of the MVRA, that court held that "a district court

may—indeed, must—impose orders of restitution on defendants convicted of crimes identified in the MVRA even if their victims decline restitution." United States v. Johnson, 378 F.3d 230, 244 (2d Cir. 2004). That court rejected the defendant's argument that § 3664 precludes ordering restitution to the Fund when the victim does not assign her interest because the permissive language of § 3664(g)(2)—"[a] victim may . . . assign the victim's interest in restitution payments to the Crime Victims Fund"—does not foreclose the ability of the court from assigning the victim's interest as well. Johnson, 378 F.3d at 245 ("Although § 3664(g)(2) authorizes victims to make such an assignment, it does not preclude the Court from doing so.").

We respectfully disagree with the Second Circuit, for two reasons. First, the court failed to appreciate the import of § 3664(g)(1), which permits victims to decline restitution. 18 U.S.C. § 3664(g)(1) ("No victim shall be required to participate in any phase of a restitution order.") The Johnson court asserted that this provision cannot "reasonably be interpreted as carving out an exception to the mandatory nature of § 3663A," and that a victim's refusing restitution has no effect on the mandate of the court to order restitution. 378 F.3d at 245. As explained above, however, we believe that § 3664(g)(1), adopted at the same time as § 3663A, has the precise effect of carving out an exception to the mandatory nature of § 3663A. Because the MVRA only authorizes restitution payments to victims (except in certain specifically delineated circumstances), and because § 3664(g)(1) allows victims to decline restitution, the MVRA is expressly made subject to the victim accepting restitution. In other words, construing §§ 3663A

-24-

and 3664(g)(1) together means that restitution payments under the MVRA are mandated only when the victim accepts them. See 18 U.S.C. § 3663A(a)(1) (stating only that "the court shall order . . . that the defendant make restitution to the victim . . . ."). The Second Circuit's holding thus disregards the principle that "[f]ederal courts cannot order restitution in a criminal case without a statutory basis." Pawlinski, 374 F.3d at 540.

Our second reason for disagreeing with the Johnson court reflects a deeper disagreement between our two courts about the nature of restitution. The Second Circuit has a "long-held understanding of the purposes of restitution, which include not only the compensation of victims, but also the punishment of offenders." Johnson, 378 F.3d at 245; see also United States v. Brown, 744 F.2d 905, 909 (2d Cir. 1984) ("Restitution undoubtedly serves traditional purposes of punishment."). We have consistently held, however, "that the MVRA does not inflict criminal punishment, and thus is not punitive." United States v. Serawop, 505 F.3d 1112, 1122-23 (10th Cir. 2007) (collecting cases) (emphasis in original). Accordingly, "the purpose of restitution 'is not to punish defendants or to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.'" Id. at 1124 (quoting United States v. Hudson, 483 F.3d 707, 710 (10th Cir. 2007)).

Our view of the compensatory nature of restitution further underscores our reading of the MVRA. If the victim declines restitution but the court nevertheless orders the defendant to pay a sum of money to another entity, this punishes the defendant without in any way compensating the victim. This reasoning is not inconsistent with § 3664(g)(2),

-25-

which allows victims to designate their interest in restitution to the Fund. While this provision may result in the defendant having to pay money to an entity that was not the victim of his crimes, it is still in some sense compensatory in nature to the victim. Just as most individuals who donate to charity receive a psychic benefit for their donation, a victim who designates his interest in restitution payments to the Fund may be receiving a form of emotional compensation by helping other crime victims. In this sense, the victim still receives some emotional compensation from the defendant, as she knows that the harm the defendant caused is going to benefit other crime victims. Indeed, § 3664(g)(2) is analytically no different than having a victim accept restitution from a defendant and then donate the restitution directly to a victim's charity. This reasoning clearly falls apart when the victim does not designate her interest but instead simply declines restitution, because the victim is in no way compensated if she simply declines restitution without designating her interest and the court orders the defendant to pay money to the Fund or another person or entity.

Contrary to the government's argument, our holding in United States v. Gallant does not require a different conclusion. In Gallant, one of the victims of the defendants' fraud had earlier reached a private civil settlement with the defendants in which the victim "released [the defendants] from further liability." 537 F.3d at 1249. Noting that "[t]he MVRA requires the sentencing court to provide restitution to victims," we concluded that "[a] private settlement cannot abrogate that [mandatory] language." Id. at

-26-

1250.[8] We thus held that the defendants were required to pay restitution to the victim, an investment firm, despite the existence of a private settlement generally releasing the defendants from further liability. Id.

While we agree with the government that Gallant emphasizes the mandatory nature of the MVRA, the facts of that case differ from the facts with which we are presented here. Most significantly, the victim in Gallant never renounced its interest in restitution. There is no indication in Gallant that the victim ever invoked § 3664(g)(1), either in the private settlement agreement or before the sentencing court. Although the release clause contained in the civil settlement was broadly worded, see id. at 1249 (releasing defendants "from further liability"), it does not explicitly mention restitution awards. Here, by contrast, neither party disputes that Mrs. Speakman declined restitution pursuant to § 3664(g)(1). When a victim does not specifically decline restitution, we agree with the rationale of our holding in Gallant that "[t]he MVRA requires the sentencing court to provide restitution to victims," and this overriding public policy prevents a court from concluding that a victim renounced her interest in restitution without a clear statement that the victim in fact renounces restitution. Id. at 1250. Where a victim, acting pursuant to § 3664(g)(1), clearly does renounce her interest in restitution,

---

[8] The court stated, however, that the sentencing court must nevertheless reduce the restitution received by a victim "by any amount the victim received as part of a civil settlement." Id. (quoting United States v. Harmon, 156 F. App'x 674, 676 (5th Cir. 2005) (unpublished)); see also 18 U.S.C. § 3664(j)(2) ("Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim . . . .").

by contrast, the public policy favoring restitution is simply inapplicable, as the statute requires that restitution be paid to the victim, and allows the victim to renounce restitution. See 18 U.S.C. § 3663A(a)(1).

Finding no statutory basis on which a court could have ordered Mr. Speakman to pay restitution to the Crime Victims Fund, we therefore reverse that portion of the district court's order.

## III.  CONCLUSION

For the reasons stated above, we VACATE the district court's restitution order insofar as it pertains to Merrill Lynch.  We REVERSE the district court's restitution order insofar as it ordered payment to the Crime Victims Fund.  We REMAND for further proceedings consistent with this opinion.