NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0312n.06

No. 14-3765

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 01, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| DIANE ELIZABETH NIEHAUS, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: KETHLEDGE and WHITE, Circuit Judges; LUDINGTON, District Judge.**[*]

**HELENE N. WHITE, Circuit Judge.** Diane E. Niehaus pleaded guilty, pursuant to a written plea agreement, of embezzlement by a bank employee, 18 U.S.C. § 656; money laundering, 18 U.S.C. § 1956(a)(1)(B)(i); and filing a false tax return, 26 U.S.C. § 7206(1). The district court sentenced her to a within-Guidelines sentence of sixty months' imprisonment and ordered her to pay $467,814.35 in restitution to Union Savings Bank (USB)—the bank from which she, as a branch manager, embezzled over $1 million. Niehaus now appeals, challenging the prison sentence as substantively unreasonable and the restitution order as improper because USB was, she alleges, an unindicted co-conspirator in the embezzlement and therefore not a victim entitled to restitution. We **AFFIRM**.

---

[*] The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

**I.**

Niehaus worked as a branch manager at USB's Centerville, Ohio, location from at least 2007 through her resignation in September 2011. As a branch manager, Niehaus had the ability to access USB customer accounts and transfer funds. Between October 2007 and September 2011, she frequently withdrew funds from USB customer accounts and converted the funds into official bank checks, which she then cashed or converted into additional checks that she later negotiated into cash. In an apparent effort to conceal her unlawful activities, she created numerous unsigned withdrawal slips that falsely purported to authorize the withdrawals, and although she stamped the back of many of the checks so that it would appear that the checks were credited to a customer's account, she retained the funds for her own use. In total, Niehaus embezzled $1,089,541.26 from USB customer accounts.

The Presentence Report (PSR) describes Niehaus's relevant activities as follows. Between January 2008 and January 2011, Niehaus withdrew a total of $972,527.88 from D.C. and J.C.'s accounts.[1] In 2010, she created a durable power of attorney for D.C. and J.C. granting herself their power of attorney. A USB employee notarized D.C.'s and J.C.'s signatures at Niehaus's direction even though the couple was not present at the time of notarization. Additionally, J.C. was hospitalized on the date written on the power of attorney, and D.C. had dementia, which prevented her from balancing a checkbook and cooking. Niehaus also directed the employee to notarize two letters prepared by Niehaus, gifting to her and her husband, Paul Niehaus, $220,000 from D.C. and J.C.'s USB account and $500,000 from a Benchmark Bank account. As with funds withdrawn from other USB customer accounts, Niehaus converted the money into official bank checks, which she cashed or converted into additional checks. Some of

---

[1] We continue the parties' practice of identifying the account holders by their initials to protect their privacy.

the additional checks were made payable to the Niehauses' Scottrade account, and the proceeds were then wired into their USB checking account. In January 2011, Niehaus withdrew a total of $515,559.13 from D.C. and J.C.'s certificate of deposit accounts. She deposited the funds in Benchmark Bank accounts belonging jointly to D.C., J.C., and her. Niehaus then wired $406,748.19 to Landmark Title Company to purchase a $410,000 home in Beavercreek, Ohio.

USB officials met with Niehaus in early 2010 to address the issue of unsigned withdrawal slips. During the meeting, Niehaus agreed to resign, but following the meeting, the officials received a call from one of the bank's owners stating that Niehaus had rescinded her resignation. After bank officials learned in January 2011 that Niehaus had again conducted numerous transactions in D.C. and J.C.'s accounts, they traveled with her to D.C. and J.C.'s home. Because J.C. was hospitalized at the time, they only met with D.C. Niehaus sat next to D.C. and assisted her in answering the bank officials' questions about the transactions. D.C. stated that she had given Niehaus money for a car and planned to give her money for a house. Although the bank officials were satisfied that D.C. had authorized the transactions, they advised Niehaus it was a conflict of interest for Niehaus, as the holder of D.C. and J.C.'s power of attorney, to conduct transactions for the couple while also a USB employee. They told Niehaus that D.C. and J.C. would have to transfer their money to another bank to avoid the conflict. In September 2011, the officials again met with Niehaus after they learned that Niehaus had continued to conduct transactions without obtaining customers' signatures on the withdrawal slips. They offered her a severance package of two years' salary and eighteen months' paid medical insurance, which she eventually accepted.

USB officials later learned of missing funds in other customers' accounts. USB reimbursed one customer $23,215.60, and withheld $34,000 from Niehaus's severance to repay

another after Niehaus admitted to stealing the money. When USB questioned Niehaus about the withdrawals from an account, she produced a letter allegedly from the account holder authorizing Niehaus to withdraw and keep the funds as a gift. The customer neither authored the letter nor authorized the withdrawals.

D.C. sued Niehaus in state court for misappropriating her (and her deceased husband's) money and later added USB to the suit as a defendant. To settle the suit, USB agreed to repay D.C. $834,066, and Niehaus agreed to give D.C. $365,934 that she held in a cashbox and to transfer ownership of her residence to USB.

Niehaus pleaded guilty of embezzlement by a bank employee, money laundering, and filing a false tax return. The PSR calculated a Guidelines' imprisonment range of fifty-seven to seventy-one months, and restitution of $467,814.35 to USB—the amount USB reimbursed its customers' accounts. At sentencing, after noting Niehaus had withdrawn all objections to the PSR, the court adopted the PSR's findings and imposed a within-Guidelines, sixty-month prison sentence. The court deferred calculation of restitution, and after further briefing and argument, ordered Niehaus to pay $467,814.35 in restitution to USB. Niehaus now appeals her sentence, including the restitution order.[2]

## II.

Niehaus argues her sentence of sixty months' imprisonment is substantively unreasonable. This court reviews the substantive reasonableness of a sentence for an abuse of discretion. *United States v. Shaw*, 707 F.3d 666, 674 (6th Cir. 2013). To be substantively reasonable, a sentence "must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes

_____

[2] The court also ordered $62,008 in restitution to the Internal Revenue Service. Niehaus does not challenge this part of the order.

of [18 U.S.C.] § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (internal quotation marks omitted). A sentence is substantively unreasonable if the sentencing court arbitrarily selects a sentence, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor. *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009). This court presumes a sentence within a properly calculated Guidelines range is substantively reasonable. *Shaw*, 707 F.3d at 674 (citing *United States v. Rosenbaum*, 585 F.3d 259, 267 (6th Cir. 2009)). The defendant bears the burden of showing substantive unreasonableness. *United States v. Woodard*, 638 F.3d 506, 510 (6th Cir. 2011).

Niehaus contends that her sixty-month sentence was far greater than necessary to comply with § 3553(a)'s factors, and that some unspecified prison term less than sixty months should have been imposed under 18 U.S.C. § 3553(a). For support, Niehaus emphasizes that she has no prior criminal history, has a college degree, timely pleaded guilty and accepted responsibility, and, at the time of the offenses, was the sole source of income for her family and her children's primary caregiver.

To the extent Niehaus argues the district court failed to consider these factors, we disagree. The court expressly noted that Niehaus was a "well educated" woman who "quietly us[ed] [her] training and . . . sophistication to rip off" elderly customers. The court observed that Niehaus had accepted responsibility and stated that it would "give [her] some credit for that," and acknowledged that Niehaus's conduct would separate her from her children.[3] Moreover, Niehaus does not challenge the procedural reasonableness of her sentence; hence, she forfeits

---

[3] The district court may not have considered whether Niehaus was her children's primary caregiver because the record does not support the contention. During the relevant time period, Paul Niehaus was unemployed and, according to Niehaus, was a "stay at home dad."

any argument that the district court failed to consider the § 3553(a) factors, including whether it considered her history and characteristics before imposing the sentence. *See United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007) (holding that procedural-reasonableness review includes review of whether the district court failed to consider § 3553(a)'s factors).

Niehaus also cites to several cases in which the defendants received shorter sentences for conduct resulting in greater financial loss to the victims than her conduct. She does not, however, explain how an apparent sentencing disparity renders her sentence unreasonable—by, for example, asserting that the district court gave an unreasonable amount of weight to a pertinent factor. Moreover, citing to cases involving greater loss amounts with no discussion of other operative facts, including the nature and circumstances of the offenses, does not establish a sentencing disparity that would render a within-Guidelines sentence substantively unreasonable. *See United States v. Simmons*, 501 F.3d 620, 626 (6th Cir. 2007). Niehaus has not, therefore, overcome the presumptive reasonableness of her within-Guidelines sentence.

## III.

Niehaus argues the district court erred in ordering her to pay restitution to USB because USB is not a "victim" under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. We review de novo whether restitution is permitted under the law. *United States v. Hargrove*, 714 F.3d 371, 373 (6th Cir. 2013). The MVRA defines "victim" to mean "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." 18 U.S.C. § 3663A(a)(2). Niehaus contends USB is not a "victim" of her embezzlement because it is an "unindicted co-conspirator" in her offense. She urges the court to adopt the reasoning of the Second, Ninth, and Eleventh Circuits and hold that a co-conspirator cannot be a victim entitled to restitution under the MVRA. *See In re Wellcare Health Plans, Inc.*, 754 F.3d 1234, 1239 (11th Cir. 2014) (holding that "an entity that admits to engaging in

illegal fraud cannot be a 'victim' of that fraud for purposes of the . . . MVRA"); *United States v. Lazarenko*, 624 F.3d 1247, 1251 (9th Cir. 2010) (holding that "in the absence of exceptional circumstances, a co-conspirator cannot recover restitution for crimes in which he or she participates"); *United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006) (holding that "any order entered under the MVRA that has the effect of treating coconspirators as 'victims,' and thereby requires 'restitutionary' payments to the perpetrators of the offense of conviction" is reversible error).

We need not decide whether a co-conspirator can be a "victim" under the MVRA because USB was not a co-conspirator in Niehaus's offenses. On appeal, Niehaus reinterprets the accepted facts of this case and attempts to paint USB as an "'eyes wide open' participant in the fraud." She bases her allegation that USB conspired with her on the assertions that (1) USB knew of her unlawful conduct by early 2010 when it confronted her about her fraud and asked her to resign; (2) one of USB's owners refused her resignation and thereby allowed her to continue to embezzle funds; (3) USB advised her to withdraw D.C. and J.C.'s funds and transfer the money to another bank; and (4) in the civil suit, USB agreed to release Niehaus from any and all claims relating to the litigation. The record does not support Niehaus's version of the facts.

Although it is true that USB officials approached Niehaus in early 2010, they met with her not to confront her about any alleged illegal activities but to address her practice of maintaining unsigned withdrawal slips contrary to USB policy. Indeed, her sentencing brief in opposition to the restitution order confirms that USB's general counsel "was sent by bank management to meet with Niehaus regarding unsigned suspicious withdrawals from customer accounts." Additionally, contrary to Niehaus's assertion on appeal, the record does not support that a bank owner refused to accept her resignation; rather, the owner phoned bank officials to

inform them that Niehaus had rescinded her resignation. Niehaus's brief in opposition below also does not support her position; Niehaus admitted that the owner informed the general counsel that "Niehaus would remain an employee and had rescinded her resignation." Further, the PSR states that USB officials "advised Niehaus [that] D.C. and J.C. would have to transfer their money to another bank if Niehaus was going to continue to conduct their financial transactions." It is not clear that USB directed Niehaus to move the money, but assuming USB did, it did so to avoid a conflict of interest—because Niehaus held D.C. and J.C.'s power of attorney—not to facilitate her embezzlement from their accounts. Finally, although USB released Niehaus from all claims USB had, or could have, and acknowledged "full settlement and satisfaction" of all claims, the settlement agreement also provides that its terms "are not an admission of liability by any party," and that each party denies liability. Thus, that USB released Niehaus from any claims it might have relating to her embezzlement scheme and acknowledged full satisfaction of claims does not indicate USB conspired with Niehaus to embezzle funds from USB customer accounts. In short, the record does not support Niehaus's argument on appeal that USB was a co-conspirator in her embezzlement.

Alternatively, Niehaus argues, relying on *United States v. Speakman*, 594 F.3d 1165 (10th Cir. 2010), that USB is not a "victim" under the MVRA because the civil settlement was an intervening event that broke the causal chain between Niehaus's conduct and the harm USB suffered. This argument is in essence a repackaging of Niehaus's primary argument. In *Speakman*, the defendant was a financial consultant at Merrill Lynch who, pursuant to a limited power of attorney, had authority to buy and sell securities in his wife's account, but not to use the funds or transfer the funds out of the account. Nevertheless, he transferred over $1 million from his wife's account to other accounts, converted some of the money to cash, and used a portion to

support an extramarital relationship. *Id.* at 1166–67. As a result of an arbitration proceeding, Merrill Lynch paid Mrs. Speakman $1,225,000; the award did not state the basis of Merrill Lynch's liability. *Id.* at 1168. The district court, nonetheless, ordered Speakman to pay that sum to Merrill Lynch as restitution. *Id.* The Tenth Circuit vacated the restitution order and remanded for the district court to determine whether Speakman proximately caused Merrill Lynch's harm, reasoning that, because Merrill Lynch could have been liable to Mrs. Speakman because of an intentional act it committed (rather, or in addition to, Speakman's conduct), "Merrill Lynch would not have been proximately harmed by Mr. Speakman because it was its own actions that gave rise to its liability, and thus Merrill Lynch's harm would not be directly related to Mr. Speakman's fraud." *Id.* at 1174. The court held that a person is not proximately harmed as a result of the defendant's offense, and thus not a "victim" under the MVRA, if there is an intervening cause that is directly related to the offense. *Id.* at 1172.

Here, although USB agreed to repay D.C. for her losses as part of the settlement, USB did so while expressly denying liability and providing for Niehaus's transfer of her home to USB in partial indemnification. And, because the record does not support Niehaus's allegation that USB conspired with her to embezzle funds from its customers' accounts, USB was proximately harmed by Niehaus—not its own intentional act—notwithstanding that it too had obligations to its customers. Finally, despite USB's agreement to release Niehaus from any and all liability, a civil settlement does not bind the district court in ordering restitution. *United States v. Bearden*, 274 F.3d 1031, 1041 (6th Cir. 2001) (adopting the rule that "a private settlement between a

criminal wrongdoer and his victim releasing the wrongdoer from further liability does not preclude a district court from imposing a restitution order for the same underlying wrong").[4]

## IV.

For these reasons, we **AFFIRM**.

---

[4] Even assuming arguendo Niehaus is correct, the MVRA's subrogation provision requires, if the victim has received compensation from another source, the court to order restitution "to the person who provided or is obligated to provide the compensation." 18 U.S.C. § 3664(j)(1).