SUTTON, J., delivered the opinion of the court, in which WELLS, D.J., joined. GRIFFIN, J. (pp. 670-74), delivered a separate dissenting opinion.
OPINION
SUTTON, Circuit Judge.
Officer Harold Cheirs and his partner, Officer Robinson, tried to serve an arrest warrant on Phyllis Brown at 3171 Hendricks Avenue in Memphis, Tennessee. When they got to Hendricks Avenue, they could not find a house with a 3171 address. They eventually found two houses on opposite sides of the street with a 3170 address, at which point, you might say, they were getting warmer. One of the houses presumably was mislabeled, and the officers had several options at their fingertips to figure out which house was 3171 Hendricks and which was not. They could have determined which side of the street contained odd-numbered addresses and served the warrant on the “3170” address on that side of the street. They could have checked city records or for that matter Google Maps to identify which house was the right one. Or they could have gone up to one of the houses and asked an occupant which house was 3171 Hendricks and which one was 3170 Hendricks.
The officers picked the last option — in part. Noticing that one of the two houses was occupied, they proceeded to that one. Now they were getting colder. Officer Cheirs knocked, a woman answered, and she promptly shut the door. While Officer Robinson went to the back of the house, Officer Cheirs knocked again. The occupant eventually opened the door, though not for seven or eight minutes. Instead of asking the woman what the address of the house was, whether Phyllis Brown lived there or whether this was the odd-numbered side of the street, Officer Cheirs represented to the woman that he had a warrant “for this address.” False. He had a warrant for 3171 Hendricks, and this was 3170 Hendricks.
Having no-reason to know that this representation was false and opting not to insist on looking at the warrant, the woman let the officers into the house — the house of Phyllis Brown’s hapless neighbor, Steven Shaw. The officers performed a protective sweep of the house. Instead of finding Brown, they found a lot of cocaine. They arrested Shaw, and a grand jury charged him with a battery of drug-dealing and drug-possession offenses. The district court denied Shaw’s motion to suppress the drugs found at his house. He pled guilty to distributing cocaine, see 21 U.S.C. § 841(a)(1), all the while reserving the right to appeal the suppression ruling. The district court sentenced him to 126 months in prison.
Shaw’s appeal raises two Fourth Amendment questions: Did the officers permissibly enter the house? And did they permissibly stay there long enough to see the cocaine?
As to the first question, what made the officers think this was 3171 Hendricks? And was that thinking reasonable? Was it reasonable to tell the occupant they had an arrest warrant “for this house” when that statement had at least a fifty-fifty likelihood of being false and when readily available alternatives could have confirmed where 3171 Hendricks was? The Fourth Amendment prohibits “unreasonable *668 searches and seizures.” U.S. Const, amend. IV. That means, among treatises full of other requirements, that officers must “take steps to reasonably ensure” they are not entering the wrong home when they execute an arrest warrant. El Bey v. Roop, 530 F.3d 407, 416 (6th Cir.2008); see Steagald v. United States, 451 U.S. 204, 216, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); United States v. Pruitt, 458 F.3d 477, 480 (6th Cir.2006).
The officers offer five potential reasons for entering Shaw’s house to serve this arrest warrant, and none is reasonable — singly or cumulatively. Reason one: this house was occupied, and the other was not. But the occupation of a house at a given point in the day says nothing about its address or whether the object of an arrest warrant lives there. It is quite possible, indeed, that the opposite is true — that fugitives generally do not spend a lot of time at home.
Reason two: a woman answered the door, and Phyllis Brown is a woman. Yet there were many people in the house, and the reality that one of them was a woman proves nothing. Of course, if the officers had looked at a picture of Phyllis Brown before serving this warrant, that could have confirmed or, as here, alleviated their suspicions when they met someone other than Phyllis Brown. As with other obvious options in this case — checking for the odd-numbered side of the street, checking city records, checking Google Maps — the apparent choice not to learn what Phyllis Brown looked like before serving this arrest warrant amounts to one more self-imposed shroud of ignorance that made other potential clues look more salient than they were.
Reason three: the woman closed the door upon first seeing them. Perhaps the officers could think that this reaction showed the woman was up to no good, but it does not make her Phyllis Brown (particularly when the same woman returned to the door), it does not make the house 3171 Hendricks, and it does not by itself justify entry into the house. That is all the more so here. The officers had an arrest warrant for criminal trespassing, not drug dealing or something else that an occupant might wish to hide from the officer’s view. The most law-abiding place for criminal trespassers to be is at home, on their property. The only people apparently trespassing that day were the officers.
Reason four: the officers saw scales in the house. Ditto. This might be helpful if the officers could connect this observation to Phyllis Brown and the reason for her arrest. Yet this criminal-trespassing arrest warrant had nothing to do with drug dealing, and the officers do not claim that the observation of the scale gave them exigent circumstances to enter the house.
Reason five: the officers had a fifty-fifty chance of being right, and that alone allowed them to take this approach. Yes, yes, and no. Yes, the officers had even odds of being right — at least as long as they refused to determine which side of the street contained odd-numbered houses. Yes, there was nothing wrong with going up to the house. But, no, officers may not say something is true — that they have an arrest warrant “for this house” — as a basis for obtaining entry into the house when there is a fifty-fifty probability that the statement is false. That is all the more true when there are readily available means for alleviating most, if not all, doubt about the point, and when no officer-safety concerns justify the deception. See United States v. Hardin, 539 F.3d 404, 425 n. 12 (6th Cir.2008).
*669 Law-enforcement work is not easy, and no one doubts the correlation between preserving public safety and preserving a free society. Nor does anyone doubt the imperative of allowing officers to use ruses and lies in the course of this essential work, particularly if the tools of indirection ensure police safety. Think of an undercover officer asked what he does for a living. But none of this permits officers to tell an occupant that they have a warrant to make an arrest at a given address when they do not. The officers took a knowing roll of the dice, and perhaps it would have worked had they been right as a matter of chance about the address. But when they were wrong, that was their problem, leaving them with having obtained entry into the wrong house based on a false pretense. An officer may not falsely tell a homeowner that he has an arrest warrant for a house, then use that falsity as the basis for obtaining entry into the house.
The Supreme Court has said as much. Forty-five years ago, it faced this question: whether “a search can be justified as lawful on the basis of consent when that ‘consent’ has been given only after the official conducting the search has asserted that he possesses a warrant” when he does not? The answer was no. Bumper v. North Carolina, 391 U.S. 543, 546-51, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); see also United States v. Escobar, 389 F.3d 781, 786 (8th Cir.2004) (holding that officers may not obtain consent to search through a “false claim of legal authority”). The equivalent is true here.
Is there any doubt, moreover, that the woman at the door would have denied entry had the officers told her the truth— that they had an arrest warrant for the address across the street? That is the relevance of the door-closing episode, not that it somehow showed this was 3171 Hendricks.
This is not the only problem with the encounter. Just as the officers entered the house based on a hollow representation, they overstayed their stay based on one. After the officers falsely said they had a warrant for this address, the woman trustingly let them in. The officers saw five people in the front room, and one officer asked who lived there and who owned the property. The still-unidentified woman at the front door said she lived there, and so did one of the men. One of the occupants then asked, “[W]hat address y’all looking for?” R.52 at 36. An officer responded, “3170 Hendricks.” False again. The apparent justification for this answer was the risk that, if the officers told them the truth — they had an arrest warrant for 3171 Hendricks — the occupants would “lie” and say that this was 3170 Hendricks. The officers were right about one thing — the proclivity for lying that day — as the occupants answered, falsely, that “this is 3171 Hendricks.” Seizing on the answer, the officers claim that it gave them a definitive right to stay in the house. But the officers misjudged the impact of a false response to a false statement, what you might say was being too deceptive by half. The two falsities still left the officers with a false premise— that this was 3171 Hendricks. It was not.
What a tangled web, one not even justified by the pull of expedience. Had it not occurred to anyone to ask, straightforwardly, which house is 3171 Hendricks and which house is 3170 Hendricks? That question would leave no one, truthful and deceptive alike, any room to maneuver.
But that is not the key problem. No custom of law-enforcement training of which we are aware, and certainly no custom of Fourth Amendment law, allows an officer to give a false answer to the question “What right do you have to be here?” as a basis for staying put. Just as a lie *670 about an address cannot supply the basis for entering a house, it cannot supply the basis for staying in a home once an occupant asks the officers what right they have to be there. Otherwise, an officer, when challenged over his right to enter a house, could say he had an arrest warrant when he did not. Or these officers, when asked to show the arrest warrant, could have produced a false arrest warrant, one with the wrong address. No one plausibly thinks that is permissible. See Bumper, 391 U.S. at 549-50, 88 S.Ct. 1788. Why was this law-enforcement encounter any different? The government offers no good reason, and we cannot think of one on our own.
The officers, in short and in truth, had no right to enter the house based on a falsity and no right to stay there based on a falsity. That is all there is to it, or at least almost all. One other thing: There may be good candidates for taking a stand on the exclusionary rule, but this is not one of them. The government urges us not to exclude this evidence even if the officers violated the Fourth Amendment in obtaining it. Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), it is true, recognized that the exclusionary rule often is over-inclusive, requiring courts to suppress evidence even when officers have obtained it in good faith and even when suppression does not further the central premise of the rule: deterrence. Id. at 141, 129 S.Ct. 695. But so long as there is an exclusionary rule, it seems safe to say that it will apply to officers who enter and remain in a house based on false pretenses — one step removed from the “isolated negligence” at issue in Herring and another step removed from the “attenuated” link between the officer misconduct in Herring and the arrest there. Id. at 137, 129 S.Ct. 695. Shaw’s case is not Herring’s case.
We reverse the district court’s contrary Fourth Amendment decision and remand the case for further proceedings.