*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0176p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

              *v.*                                    No. 12-3909

DOMINIC JETER,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:11-cr-00240-01—James G. Carr, District Judge.

Argued: May 2, 2013

Decided and Filed:  July 10, 2013

Before:  MERRITT, SUHRHEINRICH, and DONALD, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Rachel Braver, Hannah Miller, UNIVERSITY OF MICHIGAN LAW SCHOOL FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, for Appellant.  Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.  **ON BRIEF:** Rachel Braver, Hannah Miller, UNIVERSITY OF MICHIGAN LAW SCHOOL FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, Melissa M. Salinas, Dennis G. Terez OFFICE OF THE FEDERAL PUBLIC DEFENDER, Toledo, Ohio, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

───────────────

## OPINION

───────────────

BERNICE B. DONALD, Circuit Judge.  Defendant Dominic Jeter was charged as a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1).  After the district court's denial of his motion to suppress the firearm, Jeter pleaded guilty to the charge

1

but reserved his right to appeal the denial of the motion. Jeter was convicted, and his advisory Guidelines range was 30 to 37 months. The district court varied upward and sentenced Jeter to 45 months of imprisonment. He now challenges the district court's denial of his motion to suppress. He also challenged his sentence on the basis that it is procedurally and substantively unreasonable. For the following reasons, we affirm the judgment of the district court.

## I. BACKGROUND

On May 10, 2011, several police officers from the Toledo Police Department ("TPD") were on patrol near downtown Toledo, Ohio. While patrolling their assigned area, they came to a shopping center on the corner of Franklin and Bancroft Street. The shopping center, which contained very few stores, was located in an area from which the police department received many complaints pertaining to robberies, thefts, drug activity, and loitering.

Throughout the day, the officers noticed a distinct group of people in the shopping center's parking lot. As the district court summarized, "They were not going in or out of the stores; instead, they were simply gathered [sic], and, apparently, remaining together without any visible purpose except to be in each other's company." Among the group of people in the parking lot was a man on a bicycle, who was seen on several occasions traversing back and forth across the parking lot. After observing this group of people at least three or four times in the parking lot, TPD Officers Toth and Niles decided to address what they believed was a loitering problem because "nobody was shopping, nobody had shopping bags, nobody had any items they'd just bought."

According to the district court, Jeter was on a bicycle, but was not a member of the group allegedly loitering in the parking lot, nor was he the individual seen earlier in the day traversing the parking lot. Jeter did not arrive at the shopping center parking lot until some time after the officers saw the first man on a bicycle. When Jeter arrived, he entered a grocery store in the shopping center and purchased a snack and a bottled water. After exiting the store, he stopped for three or four minutes, consumed the snack, placed his water on his bicycle, and then began to leave the parking lot on his bicycle.

At the same time Jeter was leaving the parking lot, Officers Toth and Niles, while in their own police car, called two other police cars to the scene, each containing two officers, at least one police sergeant, a police lieutenant, and the TPD's helicopter crew to "saturate" the shopping center plaza. The officers assembled down the street away from the shopping center to discuss their strategy concerning where each officer would be positioned. The intent was to "bum rush" the parking lot with several ground units and the helicopter so as to round up the group suspected of loitering. The ground units were strategically positioned around the shopping center to prevent any member of the group in the parking lot from fleeing on foot, while the helicopter hovered overhead to provide "over watch" in the event anyone did in fact flee. In short, the manner in which the officers entered the parking lot was designed to contain the people in that area. The TPD implements this "bum rush" or "saturation" tactic "every couple weeks" in an attempt to rid problem areas of suspected criminal activity, with "added benefits" including getting "more gun[s] off the street" or "more person[s] with outstanding warrants."

As the TPD officers approached the shopping center, Officers Toth and Niles observed an African-American male on a bicycle who appeared to be the same individual the officers had spotted earlier that day. The individual on the bicycle was "the person who was of most interest all day because of his actions." The individual on the bicycle—Jeter—was pedaling normally toward Franklin Street and away from the point of entry from which Officers Toth and Niles came. As Officers Toth and Niles approached Jeter, Officer Niles rolled his window down and asked to speak with Jeter. Jeter did not respond and "started wandering away on his bike." Officers Toth and Niles then moved to prevent Jeter from exiting the parking lot. They pulled their police car into the grass in the parking lot, which effectively blocked Jeter's pathway onto Franklin Street.

Once the police car blocked Jeter's path, Jeter "had stopped at that point," and Officer Niles exited the police car from the passenger's side to talk with Jeter. Jeter then looked at both officers, dropped his bicycle, and started running away. The officers

chased Jeter down an alley. As Jeter fled, officers observed him clutching the right front pocket of his shorts. Police quickly caught up with Jeter. They seized him, searched him, and ultimately recovered a .22 caliber handgun in the right front pocket of Jeter's shorts. Jeter was transported to the TPD and charged with being a felon in possession of a firearm.

Jeter subsequently moved to suppress the gun found on his person. Following an evidentiary hearing and briefing, the district court denied the motion. Jeter then pleaded guilty to one count of being a felon in possession of a firearm pursuant to 18 U.S.C. § 922(g)(1), reserving the right to appeal the denial of the motion.

During sentencing, both Jeter and his defense counsel spoke at length about Jeter's mitigating personal history. The district court noted that Jeter was "a very young man, [who had] accumulated a very serious record." The district court recited the 18 U.S.C. § 3553(a) factors it considered in sentencing Jeter, varied upward from the Guidelines range by a total of eight months, and imposed a sentence of 45 months. Jeter timely appealed.

## II.  ANALYSIS

### A. Denial of the Motion to Suppress

On appeal, Jeter argues that the district court erred in denying his motion to suppress because he was illegally seized, and thus, the gun officers found on him is "fruit of the poisonous tree." We review the denial of a motion to suppress under a mixed standard of review: the district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed de novo. *United States v. Johnson*, 707 F.3d 655, 657 (6th Cir. 2013). On a denial of a motion to suppress, all evidence is viewed in the light most favorable to the government. *Id*. at 658. Here, neither party argues, and we find nothing in the record to suggest, that the district court committed clear error with regard to its findings of fact; thus, we defer to the district court's factual findings. *Cf. King v. Zamiara*, 680 F.3d 686, 702 (6th Cir. 2012).

In furtherance of his argument that he was unlawfully detained, Jeter asks this court to find that he was seized not once, but twice. He suggests that the first seizure occurred when officers approached him on his bicycle and he briefly stopped, and that the second occurred when officers caught him after the foot chase. He argues that the first seizure was illegal because the officers lacked both probable cause and reasonable suspicion to detain him at that point. Thus, all later interactions were tainted and, he argues, the gun should have been suppressed.

i.  The First Encounter

There are two types of seizure recognized under Fourth Amendment jurisprudence: arrests, for which there must be probable cause, and temporary detentions, such as an investigatory stop, which require a lesser showing of reasonable suspicion. An officer has probable cause to arrest an individual where the officer believes "an offense has been or is being committed [by the person to be arrested]." *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979) (alteration in original) (internal quotation marks omitted). Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a "hunch" that criminal activity may be afoot. *United States v. Young*, 707 F.3d 598, 604-05 (6th Cir. 2012). In this case, officers indeed lacked both probable cause and reasonable suspicion when they first approached Jeter.

The district court did not determine the probable cause issue; however, given the large scope of the "bum rush" tactic and the facts found by the district court, we find it necessary to address the issue. The district court credited the testimony of both Jeter and the officers as it pertained to the events occurring on the evening in question. It found that (1) Jeter was not the man on the bicycle observed earlier by the officers, (2) Jeter patronized a store in the shopping center some time after the officers had noticed the other men in the parking lot, (3) there were no complaints of loitering on that day, and (4) the individuals in the parking lot were not violating Toledo's loitering statute. Taking all these facts as true, there was no probable cause or reasonable suspicion to

detain Jeter.[1]  The fact that Jeter was a black man on a bicycle in a "high crime area" is not enough to support reasonable suspicion, let alone probable cause, where the facts indicate no laws were being broken or were about to be broken at the time officers converged upon him.  *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Nonetheless, we conclude that Jeter was not seized during his first encounter with Officers Toth and Niles.  The Fourth Amendment prohibits officers from conducting "unreasonable searches and seizures."  U.S. Const. amend. IV.  However, one is only seized within the meaning of the Fourth Amendment where an officer applies physical force to restrain a suspect or "a show of authority [that] has in some way restrained the liberty of a citizen."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  The Supreme Court expanded this standard in *California v. Hodari D.*, 499 U.S. 621, 626 (1991), and held that in order to be seized, the suspect must also *submit* to the authority of the officers.  Whether Jeter submitted to the officers when they "bum rushed" him stands at the heart of Jeter's broader argument in favor of suppression.

We have yet to address whether, under these circumstances, Jeter's momentary pause before fleeing constitutes a seizure under the Fourth Amendment.  Jeter cites the Tenth Circuit's decision in *United States v. Morgan*, 936 F.2d 1561 (10th Cir. 1991), in support of the proposition that he did in fact submit to the officers' show of authority.  In *Morgan*, the defendant was the passenger in a car that was pulled over because of its suspected involvement in a string of bank robberies.  *Id*. at 1564-65.  When the defendant exited the car, officers told him to "hold up," and the defendant responded, "What do you want?" and then backed away.  *Id*. at 1565.  Officers instructed the defendant not to run, but he did.  *Id*.  The court, relying on *Hodari D.*, found that "since Defendant, at least momentarily, *yielded* to the Officer's apparent show of authority, . . . Mr. Morgan was seized for purposes of the Fourth Amendment during the initial portion of the encounter."  *Id*. at 1567.  *Morgan* is potentially instructive;

---

[1]The government argues that although Jeter was ultimately not the individual the officers saw earlier on the bicycle, the officers nonetheless had a good faith belief that it was him and thus the exclusionary rule is inapplicable.  *See Ingram v. City of Columbus*, 185 F.3d 579, 595 (6th Cir. 1999). However, this argument presupposes probable cause, and here, officers lacked probable cause and reasonable suspicion to detain Jeter.

however, the same court later found in *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010), that the defendant Morgan's attempt at a conversation was a distinguishing factor in determining that a seizure had occurred.  Here, as pointed out by the government, *Morgan* provides little help to Jeter, as he did not attempt to converse with the officers when they approached him or when they asked him to stop.

The government's reliance on *Hodari D.*, as well as the Third Circuit's decision in *United States v. Valentine*, 232 F.3d  350 (3d Cir. 2000), and the Second Circuit's decision in *United States v. Baldwin*, 496 F.3d 215, 219 (2d Cir. 2007), is more convincing.  In *Valentine*, the Third Circuit interpreted Defendant Valentine's acts under *Hodari D.* and found that, when ordered by officers to "come over and place his hands on the car," Valentine's momentary compliance and reply of "Who[,] me?" before he fled was not a sufficient submission to authority to constitute a seizure.  232 F.3d at 353, 359.  The court reasoned that such a brief encounter (despite Valentine's verbal response to the officers as seen in *Morgan*) is "a far cry from" a seizure.  *Id*. at 359.  The *Valentine* court relied on a string of cases from various circuits.  The Ninth Circuit in *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994), referencing the Tenth Circuit in *Morgan*, held that Hernandez's momentary hesitation and direct eye contact with the officer did not constitute a submission to authority.  The First Circuit, in *United States v. Sealey*, 30 F.3d 7, 10 (1st Cir. 1994), found that where the officers called out to the defendant, the defendant looked in their direction, and then ran from the cruiser, *Hodari D.* controlled and a seizure did not occur.  Similarly, the D.C. Circuit in *United States v. Washington*, 12 F.3d 1128, 1132 (D.C. Cir. 1994), held that there was no submission to authority and thus no seizure when the defendant was pulled over by an officer who had his sirens on and the defendant initially stopped the car but then fled when the officer approached the car.

In the instant case, Jeter paused briefly when Officers Toth and Niles approached him, but then proceeded to discard his bicycle and flee on foot.  Jeter's actions are not materially distinguishable from the aforementioned cases.  Jeter's momentary pause can hardly be considered a submission to authority, especially where he did  not attempt to

converse with the officers. In fact, Jeter intentionally ignored the officers and their requests. As such, we find that Jeter did not submit to authority as required by *Hodari D.* Where there is no seizure, there can be no Fourth Amendment violation. *See Hodari D.*, 499 U.S. at 626; *see also Galas v. McKee*, 801 F.2d 200, 202 (6th Cir. 1986).

ii. The Second Encounter

There is no dispute, however, that after Jeter fled he was seized when officers tackled him to the ground and arrested him. Jeter's primary argument is that officers lacked sufficient justification to seize him at this point because they provoked his flight, rendering any evidence recovered tainted and inadmissible. In light of the particular facts of this case, we disagree.

This Circuit has not yet addressed what constitutes a provoked flight. Other circuits, and the Supreme Court, have touched on this issue, but the law is far from developed. In *United States v. Franklin*, 323 F.3d 1298, 1302 (11th Cir. 2003), the Eleventh Circuit found that "officers cannot improperly provoke—for example, by fraud—a person into fleeing and use the flight to justify a stop." In *Franklin*, a Special Weapons and Tactics team (SWAT) was investigating "problem areas" of a city and patrolling for crimes, including loitering. *Id.* at 1300. The officers noticed Franklin standing under a "No Loitering" sign and pulled their van up in front of Franklin. *Id.* The officers were in full body armor and their uniforms were clearly marked as law enforcement. *Id.* When they emerged from the van, Franklin saw the officers and ran. *Id.* After a brief chase, the officers secured Franklin. *Id.* Upon searching his person, they found marijuana and crack cocaine. *Id.* Franklin's motion to suppress those items was denied. *Id.* In affirming the denial, the Eleventh Circuit reasoned that, while being confronted with a fully-armored SWAT unit can be intimidating, Franklin's "flight suggested it was from the law instead of from a perceived place of danger." *Id.* at 1303. The court used a "reasonable person" test and found that a reasonable person would not have behaved the way Franklin did, due in large part to the length and nature of his flight, as opposed to moving away from the building due to a fear of imminent danger—a logical move in response to the presence of a SWAT unit. *Id.* at 1302-03.

The Seventh Circuit's decision in *Marshall ex rel. Gossens v. Teske*, 284 F.3d 765 (7th Cir. 2002), on which Jeter relies, also touches on provocation. As he does with *Franklin*, Jeter focuses on the court's distinction between provoked and unprovoked flight; however, he fails to distinguish the facts. In *Marshall*, the defendant was faced with masked men running at him with guns. *Id*. at 768. In fact, Marshall ran *toward* a uniformed police officer for help. *Id*. at 769. Using a similar rationale as in *Franklin*, Marshall clearly feared imminent harm and thus was justifiably provoked to flee.

Lastly, the Supreme Court in *Illinois v. Wardlow*, 528 U.S. 119 (2000), held that an individual's unprovoked flight was sufficient to give officers reasonable suspicion to conduct a *Terry* stop. 528 U.S. at 125. The Court mentioned "unprovoked" flight where the defendant fled upon seeing the police, but it did not define the term, nor provide examples for what constituted provoked flight. Applying the terms as they relate to the facts in *Wardlow,* a reasonable interpretation would be that an unprovoked encounter at least includes situations where the police did not converge upon, surround, or even approach the defendant before he ran. A provoked encounter, then, would require something more, possibly as little as officers merely making contact with the defendant before flight. The distinction in *Wardlow* between "provoked" and "unprovoked" is not terribly helpful as it pertains to the facts of his case.

Despite the lack of clarity on the matter of provoked flight, we can certainly extrapolate some guiding principles. Fraud, for example, would surely suggest wrongdoing on the part of the officers and thus make a finding of provocation more likely. If police officers put a defendant in reasonable fear of physical harm, that might also qualify as provocation.

Here, however, there is no evidence that the TPD officers used fraud to provoke Jeter's flight, and we cannot say that Jeter fled due to a fear of imminent harm. While the officers' convergence upon the parking lot with several police cruisers and a helicopter may have been grand in scope compared to the crime they were investigating and, as such, intimidating, Jeter fled in a manner suggesting an attempt to escape from law enforcement. Jeter did not just "get out of the way" or attempt to run back into the

grocery story for fear of imminent danger; he purposefully ran down an alley, initiating a brief police chase. Thus, while we recognize that there are situations in which flight is provoked and thus cannot be the basis for a *Terry* stop, this is not such an instance.

More to the point, there is no evidence suggesting that the TPD officers intended for or expected Jeter to flee. At the suppression hearing, one of the two officers that first approached Jeter in the parking lot testified as to what a "bum rush" is and why they use this particular tactic. Officer Toth explained that this parking lot is located in a high crime area where they often receive complaints that individuals are loitering, as well as complaints of robberies, thefts, and drug activity. He further testified that when they attempt to enforce the loitering statute in this area, "it will almost always end up in a foot pursuit, which is dangerous for ourselves and the suspect. So the more [officers] we have coming from different angles, we usually can prevent that." Later in the hearing when asked if the manner in which the officers entered the parking lot was designed to contain the people there, Toth testifed:

> Yes, sir. As I spoke earlier, if one officer goes in there -- say we would definitely have a call there. There was a group. Everybody sees a police car. Everybody goes a different [w]ay. Almost always will end up in a foot pursuit. If you're trying to chase one person, that's not safe. If we have several police officers come in from different angles and the benefit of having a helicopter, it's safer for everyone all around, the entire community.

An admission that a situation often results is a foot pursuit does not mean that the officers were trying to make the individual flee. This testimony shows that the officers actually wanted the exact opposite of a foot pursuit and designed the tactics to avoid that result.

But there are three other strong reasons why Jeter's provocation argument fails. Perhaps most important is the fact that none of the other individuals seized in the parking lot fled from the officers. Notably, Jeter was not the only individual converged upon in that parking lot. The "bum rush" was focused on the entire group of individuals in the lot, and even Jeter's defense counsel admitted to the district court that the *group* was bum rushed, not just Jeter. There was testimony that there was anywhere from five to

twenty other individuals in the parking lot, a fact that Jeter does not dispute. Arguably, three police cars and a helicopter is not excessive in light of the number of individuals involved, the fact that it is a high crime area, and the fact that most individuals approached in this parking lot have fled from the TPD in the past.

Next, only Officers Toth and Niles initially approached Jeter—not all of the officers deployed for the "bum rush." The two officers rolled down the window of their squad car and asked to speak with Jeter, and it was at that point that Jeter decided to flee. As stated in Jeter's brief below, "*One* marked unit pulled onto the grass median near the sidewalk in front of Jeter."

Lastly, Jeter admitted to officers after he was arrested that, "I ran because I had a gun." Ultimately, this admission and the fact that Jeter was the only person to flee from the "bum rush" undermines his contention that he was improperly provoked into fleeing.

The seizure in this case ultimately rests on the holdings of *Terry v. Ohio* and *Illinois v. Wardlow*. Under *Terry* and its progeny, the Supreme Court has held that an officer who has a reasonable, articulable suspicion that criminal activity is afoot, may conduct a brief investigatory stop and may search that individual in the interest of officer safety. *See Terry*, 392 U.S. at 21-23. Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a "hunch." *Id.* at 27; *see also United States v. Young*, 707 F.3d at 604-05. Thus, *Terry* provides the framework for Jeter's seizure and *Wardlow* provides the justification.

*Wardlow* is dispositive of whether a fleeing suspect gives officers reasonable suspicion to conduct a *Terry* stop. 528 U.S. at 125-26. *Wardlow* held that flight "is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124. Here, Jeter fled in response to the presence of law enforcement, and, as credited by the district court, grabbed the front right pocket of his shorts as he fled, giving officers a belief that he possibly had contraband. The district court correctly found that Jeter's flight, in combination with the grabbing of his pocket in a "high crime area," provides the inference of suspicious behavior that justifies a *Terry* stop under *Wardlow*. *Id.* at

124-25.  There are innocent reasons to flee, but *Terry* permits "officers [to] detain the individuals to resolve the ambiguity."  *Id*. at 125 (citing *Terry*, 392 U.S. at 30).

Because officers had reasonable suspicion to stop Jeter once he fled, Jeter was legally seized, and the gun found in his possession was not fruit of the poisonous tree. Accordingly, the district court did not abuse its discretion in denying Jeter's motion to suppress.

**B. Procedural Reasonableness**

Jeter next argues that his sentence was procedurally unreasonable.  We typically review a sentence for procedural reasonableness under a "deferential abuse-of-discretion" standard.  *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010) (internal quotation marks omitted).  However, the government contends that we should review this particular claim for plain error because Jeter did not object to procedural reasonableness below.  *See United States v. Vonner*, 516 F.3d 382, 385-86, 390-91 (6th Cir. 2008) (holding that because the district court must specifically ask for objections under *United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004), plain error review applies where the defendant does not object to procedural reasonableness either before or after the court solicits objections); *see also United States v. Simmons*, 587 F.3d 348, 357-58 (6th Cir. 2009) (holding that an issue is not properly preserved where, in response to the *Bostic* question, defendant raises an "objection not previously made" on "the procedural, substantive aspects" because it was too general to give the court opportunity to correct error).  The government focuses specifically on the objection counsel made in response to the *Bostic* question after the court stated its § 3553(a) reasons for the sentence. Counsel objected "to whether or not the sentence is substantively reasonable and whether The Court has offered sufficient bases," and then said that it was on the basis of "whether or not the reasons offered are substantively reasonable, not whether The Court's made a procedural error."

At first glance, it does appear that Jeter failed to object to the procedural reasonableness of his sentence with sufficient specificity, but we consider the government's argument in light of this court's decision in *United States v. Herrera-*

*Zuniga*, 571 F.3d 568 (6th Cir. 2009). In *Herrera-Zuniga*, we wrestled with a similar question, and determined that, due to the overlapping nature of the procedural and substantive reasonableness components, the *Vonner* forfeiture rule should not be applied where challenges to substantive reasonableness could also be considered a procedural reasonableness claim. *Id*. at 579-80. Here, Jeter's claims of substantive and procedural reasonableness overlap in that they both concern whether the district court properly considered certain § 3553(a) factors. Accordingly, we apply the abuse of discretion standard.

A sentence is procedurally unreasonable where the district court fails to properly calculate the Guidelines range, "treat[s] the Guidelines as mandatory, fail[s] to consider the § 3553(a) factors, select[s] a sentence based on clearly erroneous facts, or fail[s] to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). Jeter claims that his sentence was procedurally unreasonable because the district court (1) failed to address his personal characteristics under § 3553(a); (2) failed to relate the § 3553(a) factors to the variance; and (3) based the sentence on general deterrence principles not specific to Jeter. These arguments are unavailing.

Jeter asserts that after hearing what amounted to several pages of transcript testimony at the sentencing hearing regarding his childhood and life in and out of foster homes, the district court failed to consider this information prior to sentencing. Jeter insists that "there is no indication the district court considered [his] personal history[,]" but only his criminal history. The sentencing transcript shows otherwise. Almost immediately after hearing Jeter and his counsel explain his personal history at length, the district court stated, "I've taken into consideration the defendant's characteristics and circumstances of this offense." While the district court did not specifically state that it considered Jeter's familial and substance abuse issues, it was not required to do so. *See United States v. Collington*, 461 F.3d 805, 809 (6th Cir. 2006) ("While the district court did not explicitly name each of the 3553(a) factors that it was using to arrive at Collington's sentence, a reasonable sentence based on consideration of the factors does not require a rote listing."). Here, the district court's statement, especially viewed in

context, shows that it considered Jeter's personal characteristics in conjunction with the circumstances of the offense and his criminal history.

Jeter also contends that the sentence is procedurally unreasonable because the district court failed to adequately justify the eight-month variance. Again, the record belies this contention. The district court emphasized the severity of the offense and its impact on the community, but throughout the hearing, the court took particular issue with Jeter's previous gun crimes.[2] The district court could have more clearly explained its reasoning for the upward variance, but its justification was not inadequate. A district court must state "the specific reason" for its variance. *See United States v. Johnson*, 640 F.3d 195, 207 n.7 (6th Cir. 2011) (citing *United States v. Dawe*, 362 F. App'x 436, 439-40 (6th Cir. 2010)). Here, the district court stated it was imposing a "severe sentence" in large part because of the "kind of record" Jeter has amassed. The district court also stated that "enhancement of the sentence is necessary to protect the public through incapacitation of this defendant as to whom prior periods of confinement did not work." Thus, the district court specifically and adequately stated that Jeter's prior criminal offenses and the need for deterrence were its reasons for the variance.

Jeter's final argument for a finding of procedural unreasonableness is that the district court's reliance on deterrence was general and not specific to Jeter. Again, the record does not indicate this is the case. As stated, the district court spoke numerous times to Jeter's prior criminal history and the fact that his other terms of imprisonment did not deter him from continuing to break the law. Further, the district court specifically stated, "to make myself clear for the third time, deterrence is a fundamental objective of my sentence, both individual and public." These considerations and statement by the district court clearly show that deterrence specific to Jeter was used in fashioning his sentence. Accordingly, we find that Jeter's sentence is procedurally reasonable.

---

[2]The district court initially indicated its belief that Jeter's pre-calculated criminal history category of 17 was understated by one level due to Jeter's other gun crimes, but nonetheless, it did not increase it to 18.

**C. Substantive Reasonableness**

Lastly, Jeter argues that his sentence is substantively unreasonable. As is the case with a procedural reasonableness challenge, substantive reasonableness is reviewed for abuse of discretion. *Gall*, 552 U.S. at 46. A sentence falling within the Guidelines range is presumptively reasonable; one falling outside the Guidelines range carries no such presumption. *Herrera-Zuniga*, 571 F.3d at 582. "A sentence is substantively unreasonable if the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Shaw*, 707 F.3d 666, 674 (6th Cir. 2013) (internal quotation marks omitted). Jeter argues that the district court gave an unreasonable amount of weight to general deterrence, which also resulted in a failure to consider all relevant factors, such as personal history. Having determined that the district court did indeed consider Jeter's personal characteristics, the only issue necessary to address is the weight given to deterrence.

It is true that the district court gave a significant amount of weight to deterrence, both individualized and general. However, this assignment of weight was not unreasonable. Not only does the sentencing transcript reveal that the district court considered the other factors, the district court emphasized that firearms offenses were a serious, continuing problem for Jeter and the community in Toledo. It also stressed Jeter's inability to learn from his mistakes and past incarcerations. As such, the district court did not accord an *unreasonable* weight to deterrence and provided a sufficient basis for finding that Jeter's sentence is substantively reasonable. *See Herrera-Zuniga*, 571 F.3d at 591 (finding the district court's sentence substantively reasonable where it considered the defendant's "significant criminal history, his repeated recidivism, the seriousness of his offenses, the nature and circumstances of his latest offense, . . . and the need to protect the public. . .". In keeping with the amount of deference owed to the district court's sentencing determinations, *id.*, we find that Jeter's sentence is substantively reasonable.

## III.  CONCLUSION

Given the foregoing, we affirm the judgment of the district court.