NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0522n.06

No. 14-3721

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | **FILED** |
| | ) | Jul 23, 2015 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| KENNETH KEY, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |
| | ) | |

**Before: GILMAN, COOK, and KETHLEDGE, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** This is a classic "stop and frisk" case where a pat-down search uncovered defendant Kenneth Key's concealed handgun. The sole issue on appeal is whether the district court erred in denying Key's motion to suppress the evidence. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

The district court aptly summarized the underlying circumstances of this case as follows:

On August 18, 2013, Youngstown Police Department Officer Marcin Stachowicz was on patrol on the north side of the City of Youngstown. At approximately 10:46 pm, Officer Stachowicz observed threes [sic] males walking in the street instead of the sidewalk. It is undisputed that walking in the street when a sidewalk is provided and its use is practicable is a violation of Youngstown Municipal Ordinance 371.05. While talking with the men, Officer Stachowicz smelled marijuana. He further noted that Key and another man were wearing winter coats on a hot summer night. Because the men were wearing heavy coats in the middle of summer, Officer Stachowicz believed they were

concealing weapons and was thus concerned for his safety, as he was alone with the men at night on a poorly lit street.

Officer Stachowicz asked for the men's identification and informed them that he was going to do an identity check via LEADS and a pat down search for weapons. Defendant Key stated "Oh, I have nothing on me and you can check me. I am good." Officer Ryan Laatsch then arrived on the scene to assist Officer Stachowicz. Officer Laatsch observed Key whisper to his companion, and attempted to conduct a pat down for weapons. Key began to walk away from the Officers. Officer Laatsch ordered Key to stop and come back to him. Key continued to walk away with his hands at his waistband. At that time, Officer Laatsch pushed Key against his cruiser at which time Key informed him that he had a gun. Key was handcuffed and Officer Laatsch removed a loaded handgun from the left hand pocket of Key's jacket. Key was arrested and charged with carrying a concealed weapon and weapons under disability.

On November 13, 2013, Key was indicted on one count of Felon in Possession of a Firearm in violation of Title 18 USC [§§] 922(g)(1) and 924(a)(2). On January 13, 2014, he filed the [contested] motion to suppress. The Government responded and on February 10, 2014, a hearing was held on the matter and the motion was taken under advisement.

(R. 16 at 1-2)

In March 2014, the district court issued an order denying Key's motion to suppress. (R. 16)  It held that the officer had reasonable suspicion for the initial stop because Key was in violation of a city ordinance, in addition to "the recent crime in the area and the description of the suspects[,] along with what Officer Stachowicz observed, i.e., three men fitting the description of the earlier crimes, wearing clothing that in his experience indicated an attempt to conceal a weapon."   (*Id.* at 4)  The court further held that the subsequent frisk was permissible based on Key's initial consent to the search, Key's admission that he had a gun, and—if nothing else—the officers' reasonable concern for their safety due to the unseasonable attire of Key and one of his companions.  (*Id.* at 4-6)

Shortly after the district court denied his motion to suppress, Key entered a conditional guilty plea that specifically reserved his right to appeal the denial of that motion. The district court sentenced him to 39 months in prison. This timely appeal followed.

## II. ANALYSIS

The district court's findings of fact are reviewed under the clear-error standard and its conclusions of law are reviewed de novo. *United States v. Jeter*, 721 F.3d 746, 750 (6th Cir. 2013). When a district court denies a motion to suppress evidence, we consider the evidence in the light most favorable to the government. *United States v. Wellman*, 185 F.3d 651, 654-55 (6th Cir. 1999).

There is no dispute that Key and his companions were walking down the middle of the street on the night in question, and all parties agree that such conduct was in violation of a Youngstown city ordinance. Officers who watch someone violate a law have, at a minimum, reasonable suspicion to conduct an investigatory stop. *Bennett v. City of Eastpointe*, 410 F.3d 810, 832 (6th Cir. 2005) (holding that when a defendant's conduct indisputably amounts to a violation of state law, it provides reasonable suspicion for an initial stop). Moreover, Key conceded at the hearing on his motion to suppress that "[he didn't] have any problem with the initial stop and interview." (R. 35 at 30) His argument for suppression thus hinges on the propriety of the ensuing frisk.

A valid stop does not necessarily grant an officer the authority to perform a pat-down search. *Bennett*, 410 F.3d at 822. In order to frisk an individual who has been detained, an officer "must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would

be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

If the officer had frisked Key immediately after declaring his intention to do so, Key's argument might have merit. Officer Stachowicz admitted that when he first approached Key and his companions, "there were no furtive movements. We were all comfortable talking to each other." (R. 35 at 18) This rare admission saves us from having to guess at the officer's state of mind in the moments before the frisk. His testimony belies any argument that the government might have offered about Officer Stachowicz's decision to frisk stemming from concerns for his safety. Subsequent conduct aside, the officer conceded that he was not concerned when Key was initially detained.

But several key events transpired before Officer Stachowicz could effectuate a frisk. First, Key consented to be searched, claiming "I have nothing on me and you can check me. I am good." (R. 16 at 2) Key then apparently changed his mind and tried to walk away from the officers, with his hands at his waistband. (*Id.*) He did not respond when the officers told him to come back, and when they finally detained Key again, he admitted to having a gun before he was frisked. (*Id.*)

Any one of these events—consent, evasive and furtive movements, failure to respond in the face of an order, or the admission—would presumably have been sufficient to justify a frisk when considered in conjunction with the recent string of robberies and burglaries in the area and Key's unseasonably heavy attire. *See United States v. Carter,* 378 F.3d 584, 587 (6th Cir. 2004) ("It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search."); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *Jeter*,

-4-

721 F.3d at 755 (holding that an individual's failure to respond to an officer's approach, coupled with his subsequent flight, gave officers reasonable suspicion to conduct a frisk). Their cumulative effect is more than sufficient to meet the requisite standard.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.