NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  16a0663n.06

Case No. 15-6398

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Dec 09, 2016 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
| SAUL ANTONIO MENDEZ-AGUIRRE, | ) | THE MIDDLE DISTRICT OF |
|  | ) | TENNESSEE |
| Defendant-Appellant. | ) |  |
|  | ) |  |
|  | ) |  |

**BEFORE: BOGGS, GILMAN, and DONALD, Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge.**  Saul Antonio Mendez-Aguirre pled guilty to a two-count indictment charging illegal reentry into the United States.  Mendez-Aguirre now challenges his resulting sentence.  Seeing no merit in these challenges, we **AFFIRM**.

I.

Mendez-Aguirre, a native and citizen of Honduras, first entered the United States when he was twenty years old.  In March 2000, an Immigration Judge in Texas issued a warrant of deportation, and ordered that Mendez-Aguirre be removed from the United States.  In June 2007, when Mendez-Aguirre was arrested for driving under the influence (third offense), it was determined that Mendez-Aguirre had an outstanding removal order.  Pursuant to the 2000 Texas removal order, he was deported to Honduras in December 2007.  Thus began a pattern of

alcohol-related criminal offenses, deportation, and subsequent unlawful reentries for Mendez-Aguirre.

Prior to his arrest and deportation in 2007, Mendez-Aguirre had been convicted of reckless driving in 2003 after he was observed traveling the wrong way in a travel lane. He was also convicted of driving under the influence (second offense) in 2005. This time, he was found behind the wheel of his vehicle at an intersection, unresponsive and reeking of alcohol. In 2007, following the first of what would be several deportations, Mendez-Aguirre illegally reentered the United States and was again arrested and charged with public intoxication in 2009. Mendez-Aguirre was again removed from the United States in March 2010. Once again, Mendez-Aguirre unlawfully reentered the United States and was arrested for driving under the influence (fourth offense or more) in June 2011. When he was arrested, he was stopped in the lane of travel; was asleep behind the steering wheel of a vehicle with his foot on the brake and the engine running; reeked of alcohol, had bloodshot eyes, and was unsteady on his feet. In December 2011, Mendez-Aguirre was deported for the third time in four years.

For Mendez-Aguirre, the third time was not the charm. Following his December 2011 deportation, Mendez-Aguirre again illegally reentered the United States. In February 2015, he was arrested for driving under the influence (fourth offense or more). Mendez-Aguirre was arrested after a security officer noticed his vehicle proceeding through a section of grass. He was discovered asleep with his foot on the brake, the engine still running, and the vehicle placed in "drive." Mendez-Aguirre had open beer cans beside him and had the smell of alcohol.

A federal grand jury indicted Mendez-Aguirre on one count of unlawfully reentering the United States after a previous removal, in violation of 8 U.S.C. § 1326(a), and on one count of unlawfully reentering the United States following a removal subsequent to a felony conviction,

in violation of 8 U.S.C. § 1326(a) and (b)(1). Mendez-Aguirre pled guilty to the indictment and, based on a Guideline offense level of 12 and a criminal history category of IV, the district court sentenced him to a total prison term of twenty-seven months.

II.

Mendez-Aguirre raises two main issues on appeal: (1) whether, under *Brady v. Maryland*, 373 U.S. 83 (1963), the district court erred in denying his request for materials concerning fast-track programs;[1] and (2) whether the sentence imposed by the district court was either procedurally or substantively unreasonable.

In advance of sentencing, Mendez-Aguirre filed a sentencing memorandum, in which he argued for a sentence below the Guideline range. (R. 18.) In support of this, he argued that his lack of qualification for a fast-track program in the Middle District of Tennessee caused an unwarranted sentencing disparity, since he would have been eligible for the program in other districts. (*Id.* at PageID # 35–38.) Mendez-Aguirre further argued that if he had been prosecuted in San Diego, he would have had the benefit of a four-level reduction. (*Id.* at PageID # 36.) Even further, Mendez-Aguirre cited to districts in at least thirty-three states where he would have been eligible for a reduction in his Guideline range under those districts' fast-track programs. (*Id.* at PageID # 37.) The government's response first noted that the Middle District of Tennessee does have a fast-track program, but that Mendez-Aguirre was not eligible for it "because his record establishes that he is both a determined recidivist with respect to the instant offense, that is, illegal entry, and a serial felon with respect to drunken driving." (R. 19, PageID # 40–41.) The government also argued that Mendez-Aguirre failed to support his argument that

---

[1] Fast-track programs are programs adopted by prosecutors' offices to expedite illegal-reentry cases. We have previously outlined the history and use of such programs. *See United States v. Perez-Vasquez*, 570 F.3d 692, 695–96 (6th Cir. 2009).

he would be eligible for the fast-track program in other jurisdictions with evidence of the eligibility criteria in the cited jurisdictions. (*Id.* at PageID # 41.)

Mendez-Aguirre's reply argued that complete and accurate information about each district's fast-track program is solely in the possession of the government. (R. 20.) Accordingly, he requested information concerning all the details, policies, and criteria of the fast-track program in the Middle District of Tennessee; every federal judicial district in which the Attorney General maintains a fast-track program; all charging criteria and eligibility requirements that a defendant must meet to receive a fast-track sentence in each district that has such a program; the methodology used to determine the likely imprisonment range that fast-tracked defendants face in each district with such a program; and any and all other information in the government's possession concerning fast-track programs that might be favorable to Mendez-Aguirre. (*Id.* at PageID # 48–49.) At sentencing, the district court denied Mendez-Aguirre's request for materials concerning fast-track programs, finding that, under *Brady*, any fast-track policy for the district is not factually exculpatory or factually impeaching. (R. 31, PageID # 86.)

## A. Asserted *Brady* Violation

We review the district court's determination as to the existence of a *Brady* violation de novo. *United States v. Graham*, 484 F.3d 413, 416–17 (6th Cir. 2007) (citing *United States v. Miller*, 161 F.3d 977, 987 (6th Cir. 1998)). Under *Brady*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. Accordingly, a defendant seeking to establish a *Brady* violation must show that: (1) the government suppressed evidence; (2) the evidence was favorable to the defense; and (3) the suppressed evidence was material. *Graham*, 484 F.3d at 417 (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)). We have noted that

"[e]vidence is material only if there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Fields*, 763 F.3d 443, 458 (6th Cir. 2014) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)).

Mendez-Aguirre correctly notes that *Brady* applies to evidence that is material to a defendant's sentence, *see Montgomery v. Bobby*, 654 F.3d 668, 697 (6th Cir. 2011); however, he has not shown that the evidence of fast-track policies would be exculpatory or impeaching in a manner that would make them material under *Brady*. The government argues that the fast-track policies, which Mendez-Aguirre points to as material under *Brady*, "are merely internal policy documents that bestow no rights of any kind on defendants, but instead set out the criteria that various U.S. Attorney's Offices consider when deciding, as a matter of prosecutorial discretion, how to use their fast-track programs instrumentally to deal with the challenges of immigration-related crime." (Appellee Br., at 17.) We agree. *Brady* does not extend to this sort of evidence that is neither impeaching nor exculpatory, but is solely made available to a defendant as a matter of prosecutorial discretion. And Mendez-Aguirre does not cite to any authority that would allow this Court to make that leap. Even further, Mendez-Aguirre is required to show, under *Brady*, that had the government provided him with evidence of its fast-track program, the result of his proceeding would have been different. *See Fields*, 763 F.3d at 458. He has not sufficiently carried this burden. As is supported by our decision below, the record does not indicate that had Mendez-Aguirre been able to further supplement the fast-track evidence already presented to the district court, it would have been material to his sentencing.

Because the evidence upon which Mendez-Aguirre bases his *Brady* claim does not satisfy the materiality requirement of *Brady*, we need not reach the remaining requirements.

### B. Procedural and Substantive Unreasonableness

Mendez-Aguirre also challenges his sentence on the grounds that it was procedurally and substantively unreasonable. In particular, he argues that the district court wrongly concluded that it did not have authority to grant a variance based on a fast-track disparity. (Appellant Br., at 24.)

We review the procedural and substantive reasonableness of a sentence for abuse of discretion. *United States v. Collins*, 828 F.3d 386, 388 (6th Cir. 2016) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). "A district court abuses its discretion in the sentencing context if it 'commits a significant procedural error,' 'selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor.'" *Id.* (quoting *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008)) (alteration and internal citations omitted). Additionally, we "afford[] a rebuttable presumption of reasonableness to a properly calculated, within-Guidelines sentence." *United States v. Graham*, 622 F.3d 445, 464 (6th Cir. 2010).[2]

During sentencing, the district court, in response to Mendez-Aguirre's request for a downward variance, stated: "And the Sixth Circuit case law is clearly that the difference between districts that have fast track and districts that don't have fast track is not an unwarranted sentencing disparity but in fact is contemplated by the guidelines and would, therefore, be warranted as opposed to unwarranted." (R. 31, at PageID # 86–87.) Regardless, in its evaluation of the 18 U.S.C. § 3553(a) factors, the court acknowledged that the disparity caused by fast-track programs is a consideration for the court in evaluating unwarranted sentencing disparities, (*id.* at

---

[2] We note that the government contends that we should review this claim for plain error because Mendez-Aguirre did not object when the district court specifically asked for objections under *United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004). (Appellee Br., at 26–27.) However, we have held that the abuse-of-discretion standard is properly applied where, as here, the claim at issue involves an overlap of procedural and substantive reasonableness. *See United States v. Jeter*, 721 F.3d 746, 756 (6th Cir. 2013).

PageID # 110), but that the fact that the Middle District of Tennessee "may not liberally exercise its fast track policy" does not create an unwarranted sentencing disparity. (*Id.* at PageID # 111.)

For clarity, we emphasize that our precedent does not prohibit a district court from granting a downward variance based on the disparities caused by districts with fast-track programs and districts without a fast-track program. *See United States v. Camacho-Arellano*, 614 F.3d 244, 250 (6th Cir. 2010) ("[W]e repudiate any prior hint that district judges [cannot] grant variances based on the fast-track disparity."). However, while "a sentencing court has the authority to deviate from the Guidelines if it disagrees with the policy underlying the disparity created by the existence of fast-track programs in other districts, it is not required to do so." *United States v. Castaneda-Comacho*, 421 F. App'x 604, 606 (6th Cir. 2011).

In this case, we must review the reasonableness of the sentence imposed in light of the record as a whole. It does not appear from the record that the district court misunderstood the scope of its sentencing power. Further, nothing in the sentencing record leads this Court to conclude that the district court believed that it was expressly prohibited from granting a variance on this basis. Rather, the opposite is clear. The district court examined the need to avoid unwanted disparities, but stated: "And there is the question of respect for the law. The multiple or serial DUIs is a reason why this defendant would be treated differently than other defendants who have had reentry cases." (R. 31, at PageID # 112.) Because we have held that a sentencing court is not *required* to deviate from the Guidelines based on fast-track policies, *Castaneda-Comacho*, 421 F. App'x at 606, we decline to conclude that the district judge's decision not to deviate here was an abuse of discretion. Furthermore, the record indicates that the district court properly considered the § 3553(a) factors in deciding to impose a sentence within the Guideline

range. Mendez-Aguirre has not sufficiently rebutted the presumption of reasonableness that we accord such sentences.

III.

For the aforementioned reasons, we **AFFRIM** Mendez-Aguirre's sentence.